**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 93-8705
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS


ALBERT G. BUSTAMANTE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

(February 13, 1995)

Before DAVIS, BARKSDALE and STEWART, Circuit Judges.

DAVIS, Circuit Judge:

Bustamante appeals his conviction and sentence on two counts of a ten count indictment charging RICO and related offenses. We affirm.

I.

Albert G. Bustamante was elected to the United States House of Representatives in November 1984 and served until his defeat in 1992. In 1993, a federal grand jury returned a ten-count indictment against Bustamante, accusing him of using his public office for personal enrichment.

Count One alleged that Bustamante conducted the affairs of an enterprise, his congressional office, through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1962(c).

The alleged pattern of racketeering activity consisted of nine predicate acts: accepting a bribe in violation of former 18 U.S.C. § 201(c) (now § 201(b)) and accepting eight illegal gratuities in violation of current 18 U.S.C. § 201(c) and its predecessor, 18 U.S.C. § 201(g). Count Two charged Bustamante with conspiring to violate the RICO statute. In Counts Three through Ten, the same eight acts of accepting illegal gratuities were charged as individual violations of the gratuity statutes.

After a two-week trial, the jury found Bustamante guilty of Counts One and Four and acquitted him of the other charges. To support the RICO conviction, the jury found that Bustamante had committed Predicate Act One (accepting the bribe) and Predicate Act Three (accepting the same illegal gratuity charged in Count Four).

Using the United States Sentencing Guidelines, the district court sentenced Bustamante to concurrent terms of incarceration of 42 months on Count One and 24 months on Count Four, and concurrent terms of supervised release of two years on Count One and one year on Count Four. Bustamante was also ordered to pay total fines of $55,000 and a $100 special assessment.

Bustamante challenges his convictions and sentence on numerous grounds which we consider below.

## II. Sufficiency of the Evidence

Bustamante contends that the government failed to produce sufficient evidence to support his conviction on either the bribery charge (Predicate Act One) or the illegal gratuity charge (Predicate Act Three/Count Four). As Bustamante correctly points

out, his RICO conviction is based on only two predicate acts, the minimum number required to establish a pattern of racketeering activity. 18 U.S.C. § 1961(5). If the evidence is insufficient to support the jury's finding that Bustamante committed either predicate act, his RICO conviction must be overturned.

This Court will uphold a conviction as long as a rational trier of fact could have found that the evidence established the elements of the crime beyond a reasonable doubt. **United States v. Pofahl**, 990 F.2d 1456, 1467 (5th Cir.), **cert. denied**, 114 S.Ct. 266 (1993). The jury is free to choose among reasonable constructs of the evidence, which need not exclude every reasonable hypothesis of innocence. **United States v. Maseratti**, 1 F.3d 330, 337 (5th Cir. 1993), **cert. denied**, 114 S.Ct. 1096 (1994). We view all inferences from the evidence in the light most favorable to the jury verdict. **United States v. Basey**, 816 F.2d 980, 1001 (5th Cir. 1987). With these ground rules in mind, we turn to the particular facts and proof of each predicate act.

A.   The Bribe

As Predicate Act One, the indictment alleged that in February 1986, Bustamante accepted a $35,000 bribe in exchange for using his official influence on behalf of Falcon Food Services and Management, Inc. (Falcon Foods). Since 1983, Falcon Foods had held the food service contract for Lackland Air Force Base (Lackland) in San Antonio, Texas. This contract was set to expire in 1986, when the Air Force planned to conduct a competitive bidding process to award a new multi-million dollar contract. Hoping to win the renewed contract, Falcon Foods enlisted Bustamante's aid.

3

In late 1985, Bustamante invited Brigadier General Richard Gillis to lunch at a private club in San Antonio. At that time, General Gillis was in charge of the San Antonio Contracting Center, which handled all procurement for military bases in the region, including Lackland. At trial, General Gillis testified that he believed he would be having lunch only with Bustamante and did not expect to discuss the Lackland contract.

When General Gillis arrived at the club, Bustamante introduced him to Douglas Jaffe, Jr., owner of Falcon Foods, Evaristo "Eddie" Garcia, president of Falcon Foods, and Morris Jaffe, Douglas Jaffe's father. During lunch, Douglas Jaffe (Jaffe) persistently tried to persuade General Gillis that Falcon Foods was doing a great job at Lackland and should have its contract renewed. Prohibited by regulations from discussing a contract that was open to bidding, General Gillis became increasingly uncomfortable with Jaffe's lobbying effort. When his repeated attempts to change the subject were unsuccessful, General Gillis left the club.

In January of 1986, a $223,000 promissory note bearing Bustamante and his wife's signatures came due. By mid-February, the Bustamantes had paid (or made arrangements to pay) all but $35,000 of the amount owed. On February 15, although he had not yet received the remaining $35,000 from any source, Bustamante wrote a check that completely satisfied the promissory note.

Three days later, Bustamante received a check for $35,000 from Garcia, which he deposited into his bank account. This check bore the handwritten notation "sale of note." This notation allegedly referred to a $35,000 second lien note that Bustamante held on a

4

former home. Bustamante claimed that he sold this second lien note to Garcia to raise the money to pay off the balance of the $223,000 promissory note. However, no other written documentation of the alleged sale was produced at trial. Additionally, though it had a face value of $35,000, in February 1986 the second lien note's present value was only $22,000.

At the time that he wrote the check to Bustamante, Garcia only had $493.42 in his checking account; within a few days, Garcia's account had overdrawn by more than $34,000. Douglas Jaffe wrote Garcia a $35,000 check from Jaffe's personal account, which Garcia deposited on February 24.

At some point in February, Bustamante also applied for a $35,000 loan from San Antonio Savings Association (SASA). On February 25, SASA approved the loan. Bustamante took no prompt action on the loan.

On March 4, Bustamante placed a telephone call to Isodoro Leos, the officer assigned to handle the Lackland contract, and left a message complaining about the fact that the Air Force had delayed bidding on the Lackland contract. Returning the call, Leos informed Bustamante's secretary that the Congressman should make his future inquiries in writing.[1]

The next day, Bustamante closed on the SASA loan and executed a $35,000 promissory note. Bustamante secured the loan with the same second lien note he claimed to have sold to Garcia weeks earlier. On March 14, SASA issued a $35,000 cashier's check to

---

[1]The government argued that this event made Bustamante realize that his illicit advocacy might be exposed, causing him to take action to cover up the money he had received.

5

Bustamante, representing the principal of the loan. The back of the check showed that Bustamante endorsed both his and his wife's names. The check also bore a typewritten notation stating "Deposit Only to the HSB Construction Inc. Account" and listing an account number. HSB Construction belonged to Douglas Jaffe. Unlike most of Jaffe's companies, however, HSB Construction was not a subsidiary of Jaffe's corporate umbrella, the Jaffe Group, Inc.

On March 18, the Air Force opened the sealed bids for the Lackland Contract. Falcon Foods had submitted the highest of seven bids. Following standard procedure, the Air Force began to work its way up from the bottom of the list, looking for the lowest bidder that was also "responsive and responsible," factors having to do with a contractor's ability to carry through on its promised performance. After disqualifying the two lowest bidders, the Air Force found itself running out of time to hire a new contractor before the existing Falcon Foods contract expired on April 30.

To ease the time crunch, on April 17 the Air Force attempted to exercise its contractual option to temporarily extend its existing contract. Unfortunately for the Air Force, the notification deadline had expired two days earlier. No longer bound by the contract, Falcon Foods responded with a counter-offer that was $150,000 more per month than it had previously charged. The Air Force rejected the counter-offer. Afraid that it would not find a qualified bidder by April 30, the Air Force decided to place the new contract through a faster minority set-aside program operated by the Small Business Administration. In this manner, the Air Force awarded the Lackland contract to Aleman Food Service

6

(Aleman Foods).  Aleman Foods had been the fourth lowest bidder.

On April 24, the day of the award to Aleman, Leos received a call from Bustamante, who insisted that Leos explain why the original bidding process had been scuttled.  Dissatisfied with Leos, Bustamante next berated Leos' boss, the deputy director for contracting.  Still unplaced, Bustamante telephoned General Gillis and expressed his anger that Falcon Foods had not been awarded the Lackland contract.  Bustamante threatened General Gillis that he had "better turn this around" or Bustamante would end his career.  On April 25, Bustamante wrote to the General Accounting Office demanding an explanation of the award to Aleman Foods.  At approximately the same time, another disgruntled bidder obtained a restraining order that prohibited Aleman Foods from serving food until all protests to the award were resolved.  Left with no food service contractor, the Air Force fed its troops prepackaged meals from its war reserve stock from May 1 to July 31, when Aleman Foods was finally allowed to begin meal service.

To find bribery, the jury is required to find that a public official accepted a thing of value in return for being influenced in the performance of an official act.  **United States v. Evans**, 572 F.2d 455, 480-81 (5th Cir.), **cert. denied**, 439 U.S. 870 (1978).

Bustamante first contends that the government produced insufficient evidence for the jury to decide that his actions on behalf of Falcon Foods were "official acts."  This contention is spurious.  Without question, Bustamante took action in his official capacity as a congressman on a "matter" (the award of a government food service contract) which was "then pending."  18 U.S.C. §

7

201(a)(3).

Bustamante next argues that the jury could not legitimately find that the $35,000 payment from Garcia was a quid pro quo for any assistance he gave to Falcon Foods. First, Bustamante maintains that he provided an entirely innocent explanation for the $35,000 that he received from and returned to Garcia. Bustamante testified that he was on his way to SASA to borrow the $35,000 he needed to pay off his promissory note when he told Garcia, a long time friend, about the planned loan. Garcia offered to buy Bustamante's second lien note instead. Bustamante accepted, not knowing that Garcia did not have enough money to make the purchase himself. Bustamante bought back the second lien note, however, because his wife did not approve of the sale. Bustamante had already used Garcia's $35,000 to pay off his own promissory note, so he went to SASA for a loan after all, to get the money to reimburse Garcia. Bustamante asserts that he did not know that the money for the purchase really came from Jaffe, nor that the money he repaid to Garcia ended up in Jaffe's account. However, Bustamante's explanation is the type of alternative hypothesis of innocence that the jury need not exclude when reaching a guilty verdict. **Maseratti**, 1 F.3d at 337.

Bustamante also argues that the evidence does not persuasively support the government's cover-up theory - that Leos' instruction to communicate in writing spurred Bustamante to incur the SASA loan for the purpose of hiding the $35,000 payment. However, disregarding the government's cover-up theory, the evidence was more than sufficient for the jury to find that Bustamante accepted

8

a bribe in violation of 18 U.S.C. § 201(b). Bustamante received a large amount of money from the principals of Falcon Foods at a time when Falcon Foods needed Bustamante's assistance and when Bustamante needed the funds. Neither Bustamante nor Garcia documented the "sale" of the second lien note in any standard manner. Garcia, a successful businessman, supposedly purchased this second lien note at a price $13,000 higher than its present value. Though Garcia appeared to make this purchase, it was Jaffe who actually supplied the money. Additionally, Bustamante telephoned a brigadier general and threatened to end his career if the Lackland contract was not re-awarded to Falcon Foods. Given these facts, the jury's guilty verdict must stand. **See United States v. Biaggi**, 909 F.2d 662, 683-84 (2d Cir. 1990), **cert. denied**, 499 U.S. 904 (1991).

B.    The Illegal Gratuity

As Predicate Act Three and Count Four, the indictment alleged that Bustamante accepted an illegal gratuity. Unopposed in the 1984 general election, Bustamante's seat in Congress was a foregone conclusion once he won the primary election. In the period between the primary and general elections, Bustamante was invited to participate in a fledgling company called San Antonio Video Corporation (SAVC). SAVC had been organized by Oliver S. Heard and R. Lawrence Macon, both local attorneys and friends of Bustamante. Heard and Macon formed SAVC to compete for the Federal Communications Commission (FCC) license for a commercial television station.

On November 29, 1984, a few weeks after the general election,

9

SAVC filed its licensing application with the FCC.  Although the application listed Bustamante as owning 18.5 percent of SAVC, he had not actually contributed any money at that time.

To purchase his share of SAVC, Bustamante was expected to make an initial **pro rata** contribution of approximately $15,000.  This would entitle Bustamante to 16 percent of the non-voting stock; Heard, Macon, and Heard's law firm also owned portions of the non-voting stock.  SAVC also issued voting stock, which was owned by three minority women.[2]

In the event that SAVC was fortunate enough to win the FCC license, Bustamante was expected to make a second contribution of $650,000 toward the roughly $5 million start-up cost.  Like several of the other investors, Bustamante did not have the financial strength to contribute such a substantial sum.  Heard and Macon planned to borrow the start-up cost using the FCC license as collateral, then lend this money to the other investors, including Bustamante.  Macon testified at trial that, if push came to shove, he would not have forced Bustamante to repay this loan.

Bustamante did not even have the initial $15,000 on hand.  To make his up-front stock purchase, Bustamante applied for a $20,000 loan from Groos Bank in San Antonio in April 1985 (the Groos Bank loan).  According to an internal bank document entitled "Loan Application" the loan was needed to "[i]nvest in a new television broadcasting company" and was "made as a result of a specific request on the part of Oliver S. Heard, Jr., Guarantor."  The Loan

---

[2]The fact that SAVC would be controlled by minority women entitled it to a "comparative preference" during the FCC licensing process.

10

Application included Heard's financial statement, his net worth and annual income. Just three days earlier, Groos Bank had granted the Bustamantes another $20,000 loan, for personal purposes, which was also "based on the specific request and financial strength of guarantor Oliver S. Heard, Jr."

As part of the FCC's licensing procedure, SAVC and its rivals litigated their claims before an administrative law judge (ALJ). In May 1985, as part of this process, Bustamante testified about his initial stock purchase as well as the potential $650,000 future payment. Bustamante testified that he had taken out the Groos Bank loan to make his initial stock purchase in the fall of 1984. Bustamante denied that Heard had guaranteed this loan.

The FCC litigation extended over a number of years. During this time, three installments on Bustamante's Groos Bank loan became due in April 1986, 1987, and 1988. Bustamante missed all three of these payments. On April 20, 1988, Groos Bank allowed Bustamante to renew the loan by relying on Heard's original guaranty. At the same time, Bustamante took out another loan to cover the accumulated interest on the original Groos Bank loan; this loan was also covered by the Heard guaranty. In July 1988, Bustamante combined both of these loans into a single $20,140.69 obligation. Like each of the previous loans, this consolidation loan relied on Heard's guaranty. Bustamante made two of the monthly installment payments on this loan.

In October 1988, the FCC litigation finally ended. SAVC was not awarded the FCC license, but did get $175,000 in settlement from the company that did receive the license. On October 27,

11

1988, three days after SAVC received the settlement, Heard issued Bustamante a check for $19,467.53, the exact amount that Bustamante still owed to Groos Bank. Bustamante immediately repaid the consolidated Groos Bank loan in full.

SAVC's other investors did not receive such priority treatment. On October 31, 1988, Macon wrote a letter to Heard stating that before the shareholders would receive refunds of their **pro rata** contributions, the settlement money would be used to pay off SAVC's outstanding bills. This included loans that Heard and Macon had made to SAVC during its lengthy effort to obtain the FCC license. The record does not reflect whether the other SAVC shareholders ever received their share of the settlement proceeds.

To find a public official guilty of accepting an illegal gratuity, a jury must find that the "official accepted, because of his position, a thing of value 'otherwise than as provided by law for the proper discharge of official duty.'" **Evans**, 572 F.2d at 480. Generally, no proof of a quid pro quo is required; it is sufficient for the government to show that the defendant was given the gratuity simply because he held public office. **Id.** at 479; **United States v. Secord**, 726 F. Supp. 845, 847 (D.D.C. 1989) (sufficient for government to show that gratuity was given "simply because of [a person's] official position, in appreciation for their relationship, or in anticipation of its continuation"). In addition, the jury need not find that the official accepted the gratuity with the intent to be influenced. The jury must only conclude that the evidence establishes beyond a reasonable doubt that the official accepted unauthorized compensation. **Evans**, 572

12

F.2d at 480.

Bustamante's challenges to his illegal gratuity conviction rely on his interpretation of the charge against him. According to Bustamante, the indictment alleges only that he accepted two specific things of value: Heard's Groos Bank loan guaranty for the initial loan to purchase SAVC stock and the promise of future loans in the amount of $650,000, both at no risk to himself. Bustamante argues that his conviction for accepting these two things of value is invalid because the government failed to prove (1) that he knew of Heard's loan guaranty and (2) that the Groos Bank loan was actually risk-free.

Bustamante views the charge too narrowly. Bustamante was not merely accused of accepting these particular guarantees and promises, but of allowing Macon and Heard to shoulder the responsibility for his SAVC investment from start in 1984 to finish in 1988. Bustamante is correct that the indictment alleges that he accepted "Loan Guarantees ($20,000) and Promises of Loans ($650,000)", and "a loan guarantee for the purchase of stock and the promise of future loans for additional investment in [SAVC], all at no personal risk . . . ." However, the indictment also describes the broader investment scheme of which these loans were a part. For example, the indictment alleges "[Bustamante] was invited by SAVC's controllers to participate in SAVC at no personal risk to himself." The government's counsel, without objection from Bustamante, succinctly explained its theory to the jury in closing argument: "[t]he crime is a carry, a carry of Albert Bustamante in

13

this transaction."[3]

Viewed in this light, the proper question is whether Bustamante knew that Heard and Macon were giving him a risk-free investment in SAVC. We are convinced that the above evidence was sufficient to allow the jury to find that Bustamante rested firmly on Heard and Macon's shoulders for the SAVC investment. In addition, the Groos Bank officer who handled Bustamante's loans, Neyland Allen, testified that he knew of only one instance in Groos Bank history in which the bank had purposefully kept a guarantor secret from the borrower. Given Bustamante's long friendship with Heard and the context of this entire transaction, the fact that Allen could not specifically remember informing Bustamante of Heard's guaranty is not fatal. Bustamante also emphasizes that he himself testified that he did not know of the guaranty. However, the jury was free to reject this testimony. **United States v. Anderton**, 679 F.2d 1199, 1202 (5th Cir. 1982).

Likewise, Bustamante's argument that the government failed to prove that the Groos Bank loan was risk-free misses the mark. The government was required to prove what it alleged - a risk-free investment carry, not a risk-free loan. Heard and Macon gave Bustamante the precise amount needed to repay his investment loan, which exceeded the amount he actually invested, at a time when they were not repaying other investors. This fact alone strongly supports the jury's conclusion that Bustamante's SAVC investment

---

[3]Bustamante does not argue that this characterization or the proof at trial were fatally at variance with the indictment. In fact, in another section of his own brief, Bustamante argues that Count Four described a "single, continuing gratuity violation" that ended in 1988.

14

was risk-free.

Leaving no stone unturned, Bustamante also suggests that the government was required to prove that the gratuity was given in exchange for an official act. As we noted above, this is not the government's burden.

The jury was also entitled to conclude that Bustamante received the SAVC gratuity because of his status as a congressman. Bustamante was invited to invest after his seat in Congress was assured. He brought no broadcasting experience to SAVC. Because he owned non-voting stock, his Hispanic ethnicity did not contribute to the minority preference. His inclusion certainly added no financial strength to the venture. The government produced evidence that Heard's firm called on Bustamante to assist them in his official capacity, demonstrating that Heard had reason to appreciate his relationship with the Congressman and anticipate its continuation. Considering these circumstances, the jury was entitled to find that Heard and Macon sustained Bustamante throughout his SAVC investment because he was a member of the United States Congress.

C.    The Pattern of Racketeering Activity

Bustamante argues next that, even if the evidence establishes both predicate racketeering acts, the government did not prove a pattern of activity within the meaning of the RICO statute. To establish a pattern of racketeering activity, the government must show a series of at least two related predicate acts that constitute a threat of continuing racketeering activity. **Tel-Phonic Services, Inc. v. TBS Intern., Inc.**, 975 F.2d 1134, 1139-40

(5th Cir. 1992) (citing **H.J. Inc. v. Northwestern Bell**, 492 U.S. 229 (1989)).  At the time of his trial, Bustamante was no longer in office.   Thus, to satisfy the continuity requirement, the government had to establish "a closed period of repeated conduct," which it could do by showing "a series of related predicates extending over a substantial period of time."  **H.J. Inc.**, 492 U.S. at 241, 242.

Bustamante concedes that Predicate Acts One and Three are related but argues that they are not sufficiently continuous. Again, Bustamante's argument depends primarily on his constricted interpretation of the acts comprising his acceptance of the SAVC gratuity.   Bustamante argues that the gratuity offense was completed in 1985, when he accepted the loan guaranty and the promise of future loans.  He contends that when the gratuity is added to the 1986 Falcon Foods bribe, his racketeering activity occurred over a short, isolated period of approximately eleven months.   On this basis he maintains that the evidence was insufficient to permit the jury to find either that his racketeering acts covered a substantial period of time or posed a threat of ongoing activity.

Bustamante's argument is belied by the record.  As discussed above, the record reveals that Bustamante did more than accept the loan guaranty and promise of future loans in 1985 – he continued to allow Heard and Macon to carry him.  This gratuity did not end until Bustamante accepted the 1988 loan repayment.  Bustamante's racketeering acts therefore continued for a period of nearly four years.   This time period is substantial.  **See United States v.**

16

**Pellulo**, 964 F.2d 193, 209 (3d Cir. 1992); **Metromedia v. Fugazy**, 983 F.2d 350, 369 (2d Cir. 1992), **cert. denied**, 113 S.Ct. 2445 (1993). In addition, the jury was entitled to conclude that Bustamante's actions amounted to a threat of continuing criminal activity. Indeed, the gratuity itself threatened to continue as long as the SAVC investment continued; had SAVC obtained the FCC license, Heard and Macon probably would have sustained Bustamante's investment for a much longer period of time. Bustamante makes much of the fact that the jury found him not guilty of the other seven alleged racketeering acts. However, these acquittals are not inconsistent with the jury's conclusion that Bustamante's criminal behavior threatened to continue, at least during the closed-end four year period of activity. **See United States v. Freeman**, 6 F.3d 586, 596 (9th Cir. 1993) (by their nature, crimes such as bribery suggest the threat of long term activity).

### III. Statute of Limitations

Bustamante argues that his prosecution for the SAVC gratuity is barred by the five year statute of limitations in 18 U.S.C. § 3282.[4] He contends that the limitations period started to run when he first accepted the gratuity in 1985 and that it expired in 1990 long before his 1993 indictment.

Bustamante relies on **United States v. Hare**, 618 F.2d 1085 (4th Cir. 1980), in which the defendant accepted an illegal gratuity in

---

[4]At trial, Bustamante first raised this defense in a post-verdict motion for acquittal. Because we find that the gratuity charge is not barred by the statute of limitations, we decline to address whether, under the circumstances of this case, Bustamante's failure to raise this issue earlier amounts to waiver.

17

the form of a loan with favorable interest and payment provisions. Hare accepted the loan in 1970 and made periodic payments on the loan until 1975. Because Hare was not indicted until 1979, he argued that the five year limitations period had expired. The court agreed, holding that the gratuity was complete when Hare received the loan and that the statute of limitations could not be extended simply because Hare continued to benefit from the favorable terms every time he made a payment. The court based its decision on **Toussie v. United States**, 397 U.S. 112 (1970), which held that the doctrine of continuing offenses should be applied sparingly, to avoid undermining the congressional policy of repose.

**Hare** is distinguishable from Bustamante's case. The **Hare** Court itself limited its holding to the specific facts alleged in Hare's indictment, which asserted that Hare committed one act of accepting a gratuity in 1970. **Hare**, 618 F.2d at 1087. In contrast, Bustamante's indictment charges that his acts of accepting the SAVC gratuity extended over a period of years. As we explained in the previous section, Bustamante is not accused of committing a crime that has continuing effects after its completion. Rather he was charged with accepting illegal gratuities over an extended period of time. Unlike Hare, Bustamante was therefore charged with continuing criminal behavior. Accordingly, we find that Bustamante's acceptance of the SAVC gratuity occurred within the five year limitations period.[5] **See**

---

[5]This holding precludes Bustamante's argument that the district court should not have sentenced Bustamante under the United States Sentencing Guidelines. **United States v. Devine**, 934 F.2d 1325, 1332 (5th Cir.), **cert. denied**, 112 S.Ct. 349 (1991) (guidelines apply to offense initiated but not completed

18

**United States v. Morales**, 11 F.3d 915, 918 (9th Cir. 1993).

### IV.  Defense Witness Immunity

Bustamante argues next that the district court erred by not granting immunity to a trial witness, Eddie Garcia, pursuant to a grand jury immunity order.  In September 1992, the government subpoenaed Garcia to testify before the grand jury investigating Bustamante.  The government applied for and received an order compelling Garcia to testify under a grant of immunity.  Both the application and order were captioned "IN RE GRAND JURY PROCEEDINGS" and given the cause number "SA92CR270."  Under this order, Garcia testified before the grand jury twice.

In February 1993, the indictment against Bustamante was returned, creating cause number "SA93CR039."  Garcia was subpoenaed by the government to testify at Bustamante's trial.  When he received his trial subpoena, Garcia's attorney wrote a letter to the government stating that, if called at trial, Garcia would invoke the fifth amendment and refuse to testify because "it is our belief the [former immunity order] does not extend to any testimony, other than grand jury testimony, requested of him in this case."  After receiving no response, Garcia filed a motion with the trial court requesting a protective order immunizing his trial testimony and stating that the former immunity order "did not specifically require or compel [Garcia] to testify in [SA93CR039]."

Although the government never called Garcia as a witness during the trial, Bustamante did.  When Bustamante was ready to call Garcia to testify, Bustamante's attorney informed the trial

---

before October 31, 1987).

19

court that Garcia wished to speak with the court.  Garcia told the court that he wanted to testify but that "I'd like to have . . . immunity . . . I think it's only fair for me to have immunity." When the court asked if Garcia would be receiving immunity, the government responded that Garcia had been given immunity before the grand jury but that he would not be granted immunity for his testimony at trial.  The government explained that it believed that Garcia had perjured himself in his grand jury testimony.

Garcia's attorney then appeared in court to explain that, despite his earlier statements, he believed that the language of the immunity order granted Garcia immunity throughout the grand jury proceedings <u>and</u> the trial.  Garcia's attorney explained that at the time he had written the letter and motion, he did not possess a copy of the immunity order and had only seen it briefly, immediately before Garcia's grand jury appearance.  After listening to both Garcia's attorney and the government, the trial court ruled that the immunity order only applied to Garcia's testimony before the grand jury.  Believing that Garcia would not testify without immunity, Bustamante did not call him as a witness.

Bustamante now argues that the district court incorrectly interpreted Garcia's immunity order.  Bustamante cites several decisions holding that the court must interpret an immunity agreement generously to protect the witness's fifth amendment right against self-incrimination.  However, these decisions describe the rights of the party to the immunity agreement, not the rights of a third party.  Garcia's personal rights under the agreement cannot

form the foundation for Bustamante's own claim on this issue.[6]

Neither party cites, nor can we find, any case describing a defendant's right to assert error based on a trial court's interpretation of another person's immunity order.  Our review of the existing case law makes clear that a defendant's rights are only implicated by a third party's immunity status when that status intrudes on the defendant's due process protections.  In **United States v. Chagra**, 669 F.2d 241, 259-261 (5th Cir.), **cert. denied**, 459 U.S. 846 (1982), we held that the sixth amendment compulsory process right does not enable a defendant to "demand that the government shield a witness from the consequences of his own testimony."  It is also settled that, unless the government has abused its immunity power, a defendant has no due process right to have the trial court immunize defense witnesses.  **United States v. Follin**, 979 F.2d 369, 374 (5th Cir. 1992), **cert. denied**, 113 S.Ct. 3004 (1993); **United States v. Thevis**, 665 F.2d 616, 638-41 (5th Cir.), **cert. denied**, 456 U.S. 1008 (1982).  In addition, a defendant cannot prevent the government from revoking a prior grant of immunity when the government has a good faith belief that the witness testified falsely.  **United States v. Taylor**, 728 F.2d 930 (7th Cir. 1984).  These decisions illuminate the underlying principle that a defendant only has grounds to complain about the treatment of a witness's immunity when the government is using its

---

[6]Neither Bustamante nor the government frames this as an issue of standing.  It is sufficient for us to note that Bustamante has provided no reason why he should escape the general rule that a litigant cannot base her own claim on the legal rights and interests of a third party.  **United States v. Shaw**, 920 F.2d 1225, 1229 (5th Cir.), **cert. denied**, 500 U.S. 926 (1991).

immunity privilege to unfairly skew the facts presented to the jury, thereby breaching the defendant's right to due process of law. Accordingly, we evaluate Bustamante's claims under this standard.

Bustamante maintains that the government's interpretation of Garcia's immunity order is unfair because it is inconsistent with the manner in which the government treated another witness. Bustamante contends that the government informed the trial court that this witness's immunity order, identical to Garcia's, extended to testimony at trial. However, we do not read the government's statements in this way; in fact, it appears that the government was asking the court to extend the former order to apply to the trial.[7]

Bustamante also points out that the government never charged Garcia with perjury. However, this fact is not sufficient to allow this Court to infer that the government was concealing Garcia's truthful testimony because it would have helped Bustamante. **See Taylor**, 728 F.2d at 936. In fact, the record reveals that before the government was aware that Bustamante wanted to call Garcia as a witness, the government had disclosed Garcia as an unindicted co-conspirator. This detail supports the government's statement to

---

[7]The actual interchange was:
GOVT:  In March of 1992, Jerry Hoyack called before the grand          jury and was given a grant of immunity . . . and we would       like your Honor to essentially, for counsel's purposes,         sort of refresh your order compelling his testimony.
COURT:  Okay.  Does the same order, is the Government saying
        that the same order of immunity that took place before
        the grand jury, the Government intends to follow in
        trial, as well?
GOVT:  Precisely.
COURT:  So immunity is still being granted to the witness.
GOVT:  Precisely.

the trial court that it declined to further immunize Garcia because he had "outstanding criminal liability."

In sum, nothing in the record causes us to believe that the government was acting in bad faith by advocating its limited interpretation of Garcia's immunity. The record also does not in any way suggest that the trial court itself violated Bustamante's due process rights in making its ruling on Garcia's immunity. Accordingly, we conclude that Bustamante's due process rights were not implicated by the trial court's decision that the immunity order was limited to testimony before the grand jury.

Bustamante also argues that, even if the trial court correctly interpreted Garcia's immunity order, the court should have ordered immunity to stem the government's misbehavior. **See, e.g., Follin**, 979 F.2d at 374. As discussed above, the record does not support this argument. More importantly, Bustamante did not ask the trial court to grant immunity on any ground other than the existing immunity agreement. Bustamante makes no attempt to establish that the trial court was obligated to order immunity on its own initiative and we decline to bear this burden for him. **See Taylor**, 728 F.2d at 934 n.3.

## V. Prosecutorial Misconduct

Bustamante argues next that government counsel made numerous improper comments which caused the jury to be prejudiced against him. He contends that these instances of misconduct so permeated the trial that this Court should reverse his convictions.

23

A. Opening statement

Bustamante complains that, during its opening statement, the government maligned the defendants and certain witnesses, misstated evidence, attempted to establish Bustamante's guilt by association, and suggested that certain witnesses might lie. However, because Bustamante made no objection to any of these statements we will review only for plain error. **United States v. Andrews**, 22 F.3d 1328, 1341 (5th Cir.), **cert. denied**, 115 S.Ct. 346 (1994); **United States v. Bermea**, 30 F.3d 1539, 1564 (5th Cir. 1994). To meet this standard, Bustamante must prove:

(1) an error;

(2) that is obvious or "so conspicuous that 'the trial judge and prosecutor were derelict in countenancing [it], even absent the defendant's timely assistance in detecting [it],'" **United States v. Calverley**, 37 F.3d 160, 163-64 (5th Cir. 1994) (**en banc**) (quoting **United States v. Frady**, 456 U.S. 152 (1982)); and

(3) that affected the defendant's substantial rights, usually by affecting the outcome of the proceeding, **id.** (citing **United States v. Olano**, 113 S.Ct. 1770 (1993)).

In addition, we will correct a plain error affecting substantial rights only if it "'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings.'" **Id.** (quoting **United States v. Atkinson**, 279 U.S. 157 (1936)). **See also United States v. Rodriguez**, 15 F.3d 408, 414-15 (5th Cir. 1994).

We have carefully reviewed the above statements of which Bustamante complains. Even if the district court abused its discretion in allowing them, which we doubt, such error certainly did not rise to the level of plain error.

B. Improper closing argument

Bustamante argues that, during its closing argument, the

24

government improperly suggested that Jaffe, Garcia and Heard were guilty of criminal conduct and called attention to Bustamante's decision not to call them as witnesses. However, as the government points out, Bustamante's own counsel had already repeatedly highlighted the fact that the government did not call these witnesses. The district court overruled Bustamante's objection to this argument. The district court did not err in permitting the government to respond to Bustamante's own argument suggesting that the jury draw unfavorable inferences from the government's failure to call these witnesses.

C. Improper cross-examination of Bustamante

Bustamante first complains that the government suggested that he had received other uncharged illegal gratuities by asking him twice "You've never gotten anything from Doug Jaffe?" At trial, Bustamante's attorney objected on the ground that the government was trying to introduce evidence of extraneous bad acts prohibited by Federal Rule of Evidence (FRE) 404(b). The government responded that these inquiries were directly relevant to the Falcon bribe, in addition to being fair impeachment questions. The district court apparently agreed, but limited the government's questioning to Jaffe's involvement in the $35,000 payment Bustamante received from Garcia. Bustamante now argues that the question itself was improper because it implied Bustamante had received other gratuities from Jaffe. We disagree. The record leads us to conclude that a reasonable jury would interpret this question as referring to the gratuity with which Bustamante had been charged, a matter which the government was entitled to explore.

25

Bustamante next complains that the government twice asked questions intimating that Bustamante had done other improper things in his past, then stated in the jury's presence that it had outside evidence to support these questions. Bustamante contends that the government thus gave unsworn testimony about his prior bad acts. However, the record reveals that the government made these statements after Bustamante's attorney suggested in front of the jury that the government asked these questions in bad faith. In this context, the government's statements were not improper. In any event, these statements certainly do not amount to plain error, which is the applicable standard given that Bustamante never objected to them.

Bustamante also complains about two series of questions the government asked regarding two other specific instances of uncharged prior conduct: Bustamante's failure to report or pay taxes on certain income, and Bustamante's solicitation of an unrelated bribe in 1987. At trial, Bustamante objected that the government was introducing FRE 404(b) evidence without first disclosing it to the defense as required by a pretrial order. The government correctly responded that, because it was using this evidence to impeach Bustamante's credibility, FRE 404(b) did not apply. **United States v. Tomblin**, No. 93-8679, 1994 WL 720034, at *13 (5th Cir. Dec. 30, 1994). The district court allowed both lines of questioning. Bustamante now contends that these questions were highly prejudicial.

Bustamante's argument places the cart before the horse. We assess the prejudicial quality of these questions only if we

26

conclude that they were improper.  **United States v. MMR Corp.**, 907 F.2d 489, 501 (5th Cir. 1990), **cert. denied**, 499 U.S. 936 (1991). They were not.  FRE 608(b) allows the government to inquire into specific instances of conduct relevant to Bustamante's character for truthfulness.  Both the failure to report income and the solicitation of bribes are relevant to the issue of honesty.  **E.g., Tomblin** at *13.  The record reveals that, prior to embarking on each series of questions, the government informed the district court of the factual support for its inquiries, thus establishing a good faith basis for its questions.  We conclude that the district court did not err in permitting these questions.

Lastly, Bustamante asserts that the government commented on his assertion of his fifth amendment rights before the grand jury. At the start of his direct examination, Bustamante stated "I've been waiting a long time for this day to come."  On cross-examination, the government asked "You were given an opportunity to come in and tell the government your version [of the facts], weren't you?" and "I sent your attorney a letter inviting you to come in to the grand jury and tell your story under oath, at that time, didn't I?"  The district court sustained Bustamante's objections to both questions.

On appeal, the government argues that these questions were properly designed to impeach Bustamante's earlier testimony.  We disagree.  The rule is well established that a witness generally may not be cross-examined about her choice to invoke the fifth amendment privilege in grand jury proceedings.  **United States v. Robichaux**, 995 F.2d 565, 568 (5th Cir.), **cert. denied**, 114 S.Ct.

27

322 (1993). We need not consider the relationship between this rule and the government's right to impeach a witness, because in Bustamante's case the government was not fairly impeaching his earlier statement. Bustamante's general introductory remark that he had been waiting a long time for his trial date to arrive cannot be interpreted as a complaint that he had never before had a chance to speak to the government or the grand jury. The government's remarks were thus improper.

This, however, is not the end of the inquiry. We will only find reversible error if the government's improper comments cast serious doubt on the jury's verdict. **United States v. Rocha**, 916 F.2d 219, 234 (5th Cir. 1990), **cert. denied**, 500 U.S. 934 (1991). In making this evaluation, we consider (1) the likelihood and degree that the jury was prejudiced by the remarks; (2) the effectiveness of any cautionary instructions given by the court; and (3) the strength of the legitimate evidence of the defendant's guilt. **Id.**; **Andrews**, 22 F.3d at 1341. In assessing prejudice, we consider several factors, including whether defense counsel objected to the improper remark, asked the court for a curative instruction or moved for a mistrial on the ground of the misconduct. **United States v. Wright-Barker**, 784 F.2d 161, 175 (5th Cir. 1986). We consider the error in the overall context in which it occurred. **See Bermea**, 30 F.3d at 1564.

For a number of reasons, we conclude that these statements do not cast the jury's verdict into serious doubt. First, they were brief and the court sustained Bustamante's objections. Second, the court instructed the jury to disregard any questions or answers

28

that it ruled improper.  Third, counsel did not move for a mistrial or a curative instruction.  Finally, the government's proof of guilt was strong.  In the context of this three-week trial we are satisfied that these brief remarks did not prejudice Bustamante's substantial rights.[8]

VI.  **Brady** Review   Bustamante asks this court to review the transcripts of the grand jury proceedings for exculpatory evidence that the government should have disclosed.  Before trial, the district court reviewed these transcripts **in camera** and concluded that they contained no **Brady** evidence.  Without arguing that the district court erred, Bustamante asks this Court to conduct its own review of the  transcripts.  However, we decline to scour the grand jury record without some showing either that the district court failed to identify **Brady** material or that the government failed to disclose it.  **Jones v. Butler**, 864 F.2d 348, 356 (5th Cir. 1988), **cert. denied**, 490 U.S. 1075 (1989) (after district court holds **in camera** hearing, we will ordinarily not go beyond court's finding that records contain no **Brady** material).  **See also United States v. Register**, 496 F.2d 1072, 1081 (5th Cir.

---

[8]Bustamante identifies several other questions as improper. First, he complains that, in its cross-examination of Laurence Macon, the government asked questions designed to inform the jury of evidence that the trial court had previously excluded. Second, he complains that, during Rebecca Bustamante's cross-examination, the government insinuated that Bustamante had used his official influence to advance Mrs. Bustamante's career. Lastly, he complains that the government attempted to elicit testimony about Bustamante's bad character from another defense witness.  At trial, Bustamante's attorney objected to each of these remarks and the court sustained each objection.  Counsel asked for neither curative instruction nor a mistrial.  We are not persuaded that these isolated questions prejudiced Bustamante's substantial rights.

1974), **cert. denied**, 419 U.S. 1120 (1975).

## VII.   Sentencing

Bustamante argues that the sentence for his RICO conviction was impermissibly enhanced by double counting.  The district court determined Bustamante's base offense level of 19 from the RICO sentencing guideline, U.S.S.G. § 2E1.1, then increased that level by two for Bustamante's abuse of a position of public trust, under § 3B1.3.  Bustamante argues that, because his congressional office was already used to satisfy the RICO enterprise element, the district court could not also properly enhance his sentence for abusing that office.   This argument is meritless.

We agree with the analysis of the Seventh Circuit in **United States v. Ford**, 21 F.2d 759 (7th Cir. 1994).  In **Ford**, the court held:

> The crime of racketeering, [unlike simple bribery], does not in all cases entail an abuse of trust, so that the minimum base offense level of 19 already established for all RICO offenses does not already incorporate that element.  Instead, the Sentencing Commission has determined that all RICO offenses merit a minimum offense level of 19, and those RICO offenses that entail an abuse of trust must, under the logic of the Guidelines, be distinguished on the basis of that additional element by receiving the two-level enhancement.

Id. at 766.  **See also United States v. Butt**, 955 F.2d 77, 89 (1st Cir. 1992).[9]  The district court did not err in arriving at its sentence.

---

[9]The RICO sentencing guideline allows a sentencing court to derive the base offense level either from the RICO guideline or by using the offense level from the underlying racketeering acts. In Bustamante's case, the district court used the base offense level specified by the RICO sentencing guideline.  We do not address whether our decision would be different had the court taken the base offense level from the underlying bribery and gratuity offenses, §§ 2C1.1 and 2C1.2, which do not allow the abuse of public trust enhancement.

VIII.

For the reasons stated above, Bustamante's conviction and sentence are affirmed.

AFFIRMED.