*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-927

CASSANDRA LYNN HAYES, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF2-14970-11)

(Hon. Heidi M. Pasichow, Trial Judge)

(Argued November 6, 2014     Decided February 12, 2015)

*Matthew G. Kaiser*, with whom *Allison Lansell* was on the brief, for appellant.

*Anne Y. Park*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Jin Y. Park*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and BLACKBURNE-RIGSBY, *Associate Judges*, and NEBEKER, *Senior Judge*.

BLACKBURNE-RIGSBY, *Associate Judge*: Following a jury trial, appellant

Cassandra Hayes was found guilty of assault with significant bodily injury and

aggravated assault.[1]  Appellant's principal theory at trial was that Mattie Eubank ("Eubank") assaulted the victim, Eleanor Crump ("Crump").  Eubank was prepared to corroborate this theory by testifying at trial in exchange for immunity, but the government declined to immunize her after finding potential for perjury during a debriefing procedure pursuant to *Carter v. United States*, 684 A.2d 331 (D.C. 1996) (en banc).  Without immunity, Eubank invoked her privilege against self-incrimination and declined to testify about her actions during the assault.  On appeal, appellant argues that the trial court abused its discretion by failing to sufficiently inquire into the government's refusal to immunize Eubank.  Had the trial court so inquired, appellant contends, it would have found that the government had no reasonable basis for refusing immunity and therefore should have given the government the choice to grant immunity or suffer dismissal of the indictment. We affirm.

## I.    Factual Background

The events giving rise to appellant's conviction are disputed by the parties, and this dispute provides the impetus for the issues on appeal.  The undisputed

---

[1]  In violation of D.C. Code § 22–404 (a)(2) (2009 Supp.) and § 22–404.01 (2001).

facts, however, are as follows. On the evening of April 29, 2011, at around 7:00 p.m., appellant and a group of friends gathered at Kari Novelli's ("Novelli") house in Maryland for a birthday celebration. They drank alcohol at Novelli's house over the next three hours before leaving at around 10:00 p.m. in a rented limousine for a one hour ride to the District Nightclub in Washington, District of Columbia, located at 2471 18th Street, Northwest. The group brought liquor into the passenger compartment of the limousine and continued drinking during the ride. Upon arriving at the District Nightclub, they went to a reserved VIP section and continued to drink throughout the evening. At around 2:00 a.m., Eleanor Crump, the complainant, walked out of the club alone and entered the limousine, which was waiting in front of the nightclub. The limousine's driver sat in the driver seat, but Crump was the only person in the passenger compartment.

From this point, appellant and the government provide different versions of the ensuing events, though only appellant, Eubank, and Crump were direct observers. Appellant offered her own testimony at trial, which Eubank corroborated, to establish her version of events as follows. At around 2:00 a.m., one member of the group, Tiffany Fink ("Fink"), had become so intoxicated that she could no longer walk on her own, so appellant and Eubank walked with Fink from the club to the waiting limousine. As appellant and Eubank helped Fink

through the rear passenger door, appellant spotted Crump sitting inside the limousine smoking a cigarette by a window and asked Crump to move over so that they could lay Fink on the seat by the window in case she needed to vomit. Crump began to yell and curse at them and appellant responded by repeating her request more aggressively, eventually convincing Crump to move and allowing appellant and Eubank to lay Fink on the seat. Appellant sat next to Crump on the seat across from Fink while Crump continued to yell and curse, prompting appellant to say "shut up." In response, Crump spit in appellant's face and appellant pushed Crump's face away. Appellant and Eubank left the limousine and briefly spoke to Novelli on the sidewalk outside while Crump yelled after them, prompting Novelli to tell Crump to "shut up." Appellant and Eubank went to a nearby pizza shop, where appellant wiped the spit from her face and the two ordered pizza before returning to the limousine to eat. Again, Crump began to yell at appellant and Eubank, to which they responded by cursing at her and telling her to "shut up." Crump slapped the bottom of Eubank's pizza plate, knocking pizza onto Eubank. In appellant's most significant deviation from Crump's testimony, appellant testified that Eubank called Crump a b----[expletive] and pushed her, and that, in return, Crump slapped Eubank, prompting Eubank to hit Crump four or five times. Appellant then grabbed Eubank and said "let's go," and they went to a nearby café to wash a bleeding cut on Eubank's knuckle.

On the other hand, Crump testified that she does not remember how Fink got into the limousine. Rather, Crump testified that she was sitting in the limousine alone texting on her phone when, without provocation, appellant entered and began to punch her in the face, temples, and back of the head. After the punching stopped, Crump told appellant that her nose was broken and called appellant a c--- [expletive], to which appellant responded with even more punches for a longer duration. When this round of punches stopped, Crump noticed that her teeth were missing and she reached for her phone, prompting appellant to grab the phone and continue punching. Crump testified that Eubank was standing by the limousine door throughout the attack. The government corroborated Crump's testimony with that of the limousine driver, who sat in the driver's seat throughout the event with a partition separating the driver's seat from the passenger compartment lowered. He testified that Crump entered the limousine alone, looking annoyed, and was followed a few minutes later by two other girls who were not carrying Fink. Rather, he testified that Fink entered the limousine after the assault as he and Crump spoke with a police officer. Although he testified that he could not see the assault, he heard an argument and punching noises, then witnessed Crump crawl through the partition into the front seat with blood on her face.

## II.     Procedural History

Appellant's case went to trial nearly two years after the event. In a pre trial hearing on February 27, 2013, appellant indicated that she intended to offer Eubank's testimony at trial to corroborate her own version of events, namely, that Eubank, not appellant, had assaulted Crump. Because Eubank's testimony would cause her to incriminate herself, and because she requested immunity, the trial court determined that a hearing under *Carter v. United States*, 684 A.2d 331 (D.C. 1996) (en banc) was necessary to determine whether immunity is appropriate. The government granted Eubank limited immunity to debrief her on her proposed testimony and subsequently declined to grant use immunity for trial purposes, citing ten "specific reasons to believe she is not being truthful" that collectively demonstrated a likelihood of potential perjury.[2] Applying *Carter*, the trial court

---

[2] Specifically, the government identified ten factual differences between Eubank's version of events and the events described in other witnesses' testimony at a grand jury hearing and in statements to the government:
  1) Eubank stated that appellant did not say anything to Crump upon entering the limousine, while another witness testified that she overheard Hayes say "move b----[expletive]."
  2) Eubank stated that she and appellant helped Fink into the limo, while Crump did not remember seeing Fink at all and the limousine driver said Fink entered the limousine after the assault.
  3) Eubank identified herself as the assailant, while Crump identified appellant.

(continued . . .)

concluded that there was a possibility of potential future prosecution and that the government had provided a reasonable basis for declining immunity, namely, a "clear indication of potential perjury." The trial court highlighted Eubank's conflicting testimony that she struck Crump and the government's showing that, based on its investigation, its witnesses' accounts contradict Eubank's testimony in

---

(. . . continued)

4) Eubank stated that when Crump began yelling and cursing before the assault, Novelli told Crump that she was "being crazy," but Novelli did not corroborate this statement.

5) Eubank stated that Crump was yelling and cursing throughout, while the limousine driver stated that he only heard yelling immediately prior to the attack, though he could not say who was yelling.

6) Eubank stated that after four or five punches she and appellant left the limousine as Crump yelled after them to "come back," though no other witness corroborated this version of events.

7) Eubank stated that the limousine drove around the corner when Eubank and appellant exited the limousine after the assault, but the limousine driver did not corroborate this statement.

8) Eubank stated that she and appellant spoke with Novelli after the incident, telling her that Eubank fought with Crump, but Novelli did not corroborate this statement.

9) Eubank stated that she did not grab Crump's phone or see a phone, while Crump stated that appellant grabbed her phone and that there was blood on the phone.

10) Eubank's version of events does not comport with appellant's statement to police upon her arrest that appellant went home with her boyfriend that night and that no fight occurred.

The government also highlighted Eubank's bias in favor of appellant because their daughters share the same father, Eubank was appellant's closest friend at the party, appellant and Eubank vacation together, Eubank took care of appellant's child when appellant was arrested, and Eubank did not come forward to confess until contacted by appellant's attorney.

many aspects. The trial court noted that neither *Carter* nor any other case requires the government to grant immunity, and that the government had established a good-faith basis for its refusal.

At trial, Eubank testified to her version of events, but invoked her Fifth Amendment privilege against self-incrimination with regard to all the events inside the limousine from when Crump slapped the pizza plate up until Eubank and appellant left the limousine, and with regard to whether her hand was bloody. The jury did not credit the version of events presented by appellant and Eubank, and found appellant guilty.[3] Appellant brings this appeal challenging the trial court's application of *Carter*.

---

[3] Appellant also unsuccessfully moved to introduce a recorded confession from Eubank as a statement against penal interest. In the recording, Eubank voluntarily, yet anonymously, confessed to assaulting Crump to the defense attorney's investigator on February 27, 2013, the first day of trial. According to the investigator's testimony at trial, Eubank arrived at the defense attorney's office with appellant that morning and, when appellant and her attorney left for court, Eubank stayed behind to give the recorded statement. After listening to the recording, the trial court denied appellant's motion, concluding that appellant had not presented sufficient corroborating circumstances to demonstrate the veracity of the statement, as required by *Laumer v. United States*, 409 A.2d 190, 199 (D.C. 1979) (en banc), citing Eubank's nearly two-year delay in coming forward, the lack of any prior confession, the lack of any existing relationship between Eubank and the investigator, the close relationship between Eubank and appellant, and the fact that Eubank arrived with appellant to speak to the investigator. Appellant does not challenge the trial court's denial of this motion.

## III.   Discussion

On appeal, appellant contends that the trial court abused its discretion in applying *Carter* by failing to "critically inquire" into the government's determination that Eubank's proposed testimony presented "clear indications of potential perjury." Taking the government's assertions at face value, appellant argues, prevented the jury from weighing Eubank's exonerating testimony. Appellant predicts that affirming the trial court's exercise of discretion in this case will encourage the government to cry "perjury!" whenever a person other than the indicted individual comes forward to take responsibility. We disagree.

### A. *Standard of Review and* **Carter** *Analysis*

A trial court's role in the immunity-determination process described in *Carter* is to explore the basis of the government's refusal to grant immunity in order to protect the rights of the accused to due process and under the Sixth Amendment. *See Butler v. United States*, 890 A.2d 181, 189 (D.C. 2006). Whether the government's refusal to grant immunity will result in "a distortion of the fact finding process," such that sanctions are appropriate, is a discretionary call, which we review for abuse of discretion. *Id.*; *Carter, supra*, 684 A.2d at 345. We

determine whether the trial court's rational act of decision-making was based on a firm factual foundation capable of supporting it, and indeed, whether its reasoning substantially supports its eventual decision. *See Johnson v. United States*, 398 A.2d 354, 365 (D.C. 1979). If the trial court failed to consider or improperly relied upon a factor, or if the reasoning does not support the conclusion, we may determine that this error is of a magnitude requiring reversal. *Id.* at 366.

We went *en banc* in *Carter* to develop a procedure for trial courts to follow when the Sixth Amendment right to call a witness collides with that witness's Fifth Amendment privilege against self-incrimination. *Carter, supra*, 684 A.2d at 335. Rather than creating a general requirement of judicially-imposed immunity in such situations, *Carter's* process seeks to respect the government's immunity-granting function, while assigning a reviewing role to the trial court to prevent prosecutorial misconduct. *Id.* at 340. Under *Carter*, the trial court must first determine whether the proposed witness's testimony is potentially incriminating and creates a possibility of prosecution in the future. *Id*. at 344. Thereafter, the defense bears the initial burden of showing that the witness possesses "material, exculpatory and non-cumulative evidence which is unobtainable from any other source." *Id*. at 342–43. If the trial judge determines that the defense has carried its burden, the government may grant the witness limited immunity while it debriefs the witness

on the proposed testimony to make its immunity determination. *Id.* at 345. If the government offers a reasonable basis for declining to grant immunity, such as "considerations of potential future prosecution, an ongoing investigation, clear indications of potential perjury, or the excusable lack of information during the debriefing to make an informed immunity decision," its refusal to do so "would hardly be prosecutorial misconduct . . . ." *Id.* at 342.

When the government refuses to grant immunity, the trial court must review the basis of that refusal for abuse of discretion, considering whether there will be "a distortion of the fact finding process" in violation of due process. *Id.* at 342, 345 (citing *United States v. Bustamante*, 45 F.3d 933, 943 (5th Cir. 1995) for the proposition that using immunity to unfairly skew the facts presented to the jury is a violation of due process). The government may not use immunity to gain a tactical advantage, such as by "giv[ing] immunity to a prosecution witness while declining to grant immunity to a similarly situated defense witness," nor may it intimidate a witness so that the witness feels compelled to invoke the Fifth Amendment. *Id.* at 340–41. Nor may the government usurp the jury's function of determining credibility. *Id.* at 342. If the trial court determines, based on all the circumstances, that (1) the defendant will not receive a fair trial in the absence of the proposed material, exculpatory, non-cumulative, and otherwise unobtainable testimony, and

(2) the government has not provided a reasonable basis for refusing immunity, then the trial court may require the government to choose between granting immunity and having the court dismiss the indictment or impose some other commensurate remedy that the court fashions in accordance with the Sixth Amendment and due process. *Id.* at 342–43. Throughout this review process, the trial court must take care to avoid intruding into the exclusively executive function of granting immunity, particularly in light of the potential that immunity may provide opportunities to "undermin[e] the administration of justice by inviting cooperative perjury among law violators." *Id.* at 339, 343.

### B. Application

The parties do not dispute that Eubank validly asserted her Fifth Amendment privilege, nor is there a dispute as to whether the defense met its burden to show that Eubank's testimony was material, exculpatory, non-cumulative, and unavailable from any other source. *See id.* at 342–44. Rather, appellant focuses entirely on the trial court's alleged failure to sufficiently inquire into the reasons for the government's denial of immunity, which, appellant argues, were simply factual perspectives on the evening's events that did not provide a "clear indication of potential perjury." Appellant reads *Carter* to require a showing of "very serious

and clear perjury" to justify the government's refusal to grant immunity, and contends that the government presented only minor inconsistencies and weaknesses in proffered testimony, not "material factual differences" or "credibility issues that indicate as a whole that the witness is not being truthful." With the exception of the conflicting testimony about who hit Crump, appellant argues that these simple inconsistencies are present in any case, and are particularly likely when witnesses testify nearly two years after the event in question. Accordingly, appellant submits that the trial court allowed the government to use immunity to its tactical advantage and usurped the credibility-determining function of the jury.

Appellant's argument turns on an exaggerated interpretation of the government's burden to show potential perjury under *Carter*. Appellant points to a portion of *Carter* where we illustrated, by "an example," an instance where the government would not be expected to grant immunity: when the "threat of a blatant perjury" is so apparent "as to be demonstrable to the trial judge." *Id.* at 342. The government is not required to show a "threat of a blatant perjury" to justify every refusal to grant immunity. Instead, *Carter* explains that a prosecutor must have "a reasonable basis" for not granting immunity, which includes, for our purposes here, "clear indications of potential perjury" and "considerations of

potential future prosecution." *Id.* Given that our review is for abuse of discretion, a deferential standard, we must determine whether the trial court relied upon a firm factual foundation that substantially supported its decision to affirm the government's denial of immunity under *Carter. See Johnson, supra*, 398 A.2d at 364.

When the government declined to grant immunity to Eubank, it outlined ten factual discrepancies as a "reasonable basis" for its conclusion that Eubank's testimony presented "clear indications of potential perjury." *Carter, supra*, 684 A.2d at 342.[4] The trial court cited *Carter's* other "reasonable bas[es]" for declining immunity, and inquired whether the factual discrepancies also supported a possibility of prosecution. *Id.* The government answered affirmatively, but did not rely on this possibility as its primary basis. Over approximately thirty pages of transcript, the trial court analyzed the government's factual bases for declining to grant immunity and the defense's counter-arguments, stating plainly that it was aware of the value of Eubank's exonerating testimony to appellant's case, but that this was an instance where "a Sixth Amendment right . . . is colliding, if you will, with the Fifth Amendment right to not be compelled to incriminate one's self." The trial court explained its task as "exploring the basis for . . . the government's

---

[4] See *supra* note 2.

refusal [to grant immunity]" to determine whether it is "reasonable . . . or is in bad faith," and concluded that the government had made a "reasonable argument" with a "good-faith basis." *See id.* at 344.

We discern no abuse of discretion in the trial court's reading of its role under *Carter*, nor in its careful inquiry into the government's substantial factual foundation for refusing immunity. *Id.* at 342. Nor do we discern any abuse of discretion in the trial court's conclusion that the government had a reasonable basis to find a clear indication of potential perjury. *Id.* The trial judge repeatedly exercised special caution to refrain from intruding into the exclusively executive function of granting immunity. *Id.* at 343. The jury was not deprived of its ability to make credibility determinations with regard to Eubank's testimony because she did, in fact, testify to all of the evening's events, except for the assault on Crump, and she could have opted to exculpate appellant, but chose instead to invoke her Fifth Amendment privilege.

Yet this was a close case, in large part because nearly every party involved was intoxicated and the events in question occurred two years prior to trial. Prosecutors must look long and hard at cases where there is such a fine line between "clear indications of potential perjury," which is a proper basis to decline

immunity, and normal differences in perspective, which are a question of credibility for the jury. Indeed, such close calls are precisely what *Carter* contemplates. *See id.* at 342–43. Such was our impetus for clearly delineating the line between the executive branch's "exclusive constitutional authority to execute the laws and decide whom to prosecute" and the judiciary's role in protecting an accused from abuses of discretion where the government refuses to immunize a defense witness and "distort[s] the judicial fact-finding process . . . thereby preventing a fair trial for the defendant." *Id.* at 343.

Lastly, we agree with the government's proposal at oral argument to merge appellant's two assault convictions, though appellant did not raise the issue. *See Nero v. United States*, 73 A.3d 153, 159 (D.C. 2013) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)) (merging assault involving "significant bodily injury" under D.C. Code § 22–404 (a)(2) and assault involving the more severe "serious bodily injury" under D.C. Code § 22–404.01 because the former is a subset of the latter). Accordingly, appellant's assault with significant bodily injury conviction merges into her aggravated assault conviction. Our merger holding does not affect the trial court's sentence, as the sentences for these counts run concurrently.

## IV.    Conclusion

For these reasons, we conclude that the trial court did not abuse its discretion in reviewing the government's refusal to grant immunity.  Appellant's conviction of assault with significant bodily injury is merged and vacated, but her remaining conviction is hereby affirmed.

*So ordered.*