UNITED STATES of America, Appellee,

v.

SUN–DIAMOND GROWERS OF
CALIFORNIA, Appellant.

No. 97–3072.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 11, 1997.

Decided March 20, 1998.

Eric W. Bloom, Washington, DC, argued the cause for appellant. With him on the briefs were Richard A. Hibey, Michael K. Atkinson and Charles B. Klein.

Theodore S. Greenberg, Deputy Independent Counsel, Alexandria, VA, argued the cause for appellee. With him on the briefs were Donald C. Smaltz, Independent Counsel, Los Angeles, CA, and Charles M. Kagay, Chief Appellate Counsel, San Francisco, CA.

Carter G. Phillips and Griffith L. Green, Washington, DC, were on the brief for amicus curiae American League of Lobbyists.

Before: WILLIAMS, HENDERSON and TATEL, Circuit Judges.

STEPHEN F. WILLIAMS, Circuit Judge:

Sun–Diamond is a large agricultural cooperative owned by individual member cooperatives including Diamond Walnut Growers, Sun–Maid Growers of California, Sunsweet Growers, Valley Fig Growers, and Hazelnut Growers of Oregon. It came within the sights of an independent counsel, Donald C. Smaltz, who was responsible for investigating allegations of unlawful activity by former Secretary of Agriculture Mike Espy. The independent counsel charged Sun–Diamond with making illegal gifts to Espy, committing wire fraud, and making illegal campaign contributions.

Linking Sun–Diamond and Espy was the figure of Richard Douglas. As Sun–Diamond's vice president for corporate affairs,

Douglas was responsible for (among other things) representing the interests of the corporation and its member cooperatives in Washington. Given Sun–Diamond's business, the Department of Agriculture ("USDA") was naturally part of his bailiwick. According to performance evaluations signed by Sun–Diamond's president, Douglas was a diligent and able representative. He once described his approach to lobbying by paraphrasing Lord Palmerston: "We have no permanent friends or permanent enemies, only a permanent interest in Sun–Diamond Growers of California." Permanent friends aside, he had a long-time friend in Mike Espy—the two had gone to college together at Howard University and had stayed close in the years since.

The crimes charged to Sun–Diamond grow out of two largely independent stories. One involves illegal gratuities given to Espy while he was Secretary of Agriculture, the other wire fraud and illegal contributions to the congressional campaign of the Secretary's brother, Henry Espy. We save the recitation of facts for the discussion of the distinct legal issues raised by each story.

Sun–Diamond argues that under the facts alleged and proven it could not properly be found guilty of any of the offenses, and, as to the illegal gratuities, that the trial court's charge allowed the jury to convict on a theory precluded by the statute. We disagree with Sun–Diamond's claims of entitlement to dismissal of the indictment and to acquittal, but we agree that the jury charge on the gratuity counts was error and requires a remand for a new trial. Sun–Diamond also attacks the sentence, saying that the trial judge, having increased the offense level by eight for Espy's high-level status as required by the Guidelines, wrongly bumped it up another two levels on the theory that the Guidelines inadequately took that status into account. It also objects to the trial court's imposition of probationary conditions on Sun–Diamond's member cooperatives, who were neither defendants nor agents of the defendant. We agree with Sun–Diamond on both sentencing points.

\*　　\*　　\*

Illegal Gratuities

The key dispute here is over how close a link the government must show between Sun–Diamond's gifts and official acts that the Secretary of Agriculture performed or might perform. The indictment detailed two specific issues on which Sun–Diamond had a clear interest in favorable action by the Secretary. The first was the market promotion program ("MPP"), a grant fund administered by USDA and designed to prop up U.S. agricultural exports. See 7 U.S.C. § 5623. The Secretary of Agriculture was authorized to allocate MPP money to trade organizations like Sun–Diamond, who would in turn use it to defray overseas marketing expenses. According to the independent counsel, between 1990 and 1995 the Sun–Diamond member cooperatives received $23.9 million from MPP. In August 1993 Congress enacted budget legislation requiring the Secretary to give preference to "small-sized entities" in disbursing MPP funds. Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, § 1302(b)(2)(A), 107 Stat. 312, 331 (1993). Sun–Diamond and its members were hardly mom-and-pop organizations—they reported net sales of $648 million for fiscal year 1993—but many of their constituent growers were quite modest in size. Sun–Diamond therefore wanted the Secretary to adopt a regulatory definition of "small-sized entities" that would include cooperatives such as its members.

Sun–Diamond also took an interest in federal regulation of methyl bromide, a pesticide used by some of the growers who belonged to its member cooperatives. In late 1992 the Environmental Protection Agency began review of a proposal to phase out the use of the chemical in the United States because of its potential to contribute to ozone depletion. Although the methyl bromide issue was not technically before USDA, a rational jury could conclude from the trial evidence that Sun–Diamond wanted Espy to help persuade EPA to delay or reject the proposed phase-out.

Count I of the indictment charged the company with giving Espy (via Douglas) around $5,900 in illegal gratuities: tickets to the 1993 U.S. Open Tennis Tournament

worth $2,295, luggage worth $2,427, meals worth $665, and a framed print and crystal bowl worth $524.[1] The indictment further alleged that Sun–Diamond reimbursed Douglas for these outlays, treating them as business expenses.

Sun–Diamond challenges Count I, asserting that the gratuity statute, 18 U.S.C. § 201(c)(1)(A), requires the government to prove a nexus between each unauthorized gift and some specifically identified official act—performed or hoped to be performed—for which the gift was given. Because the indictment failed to allege any such one-to-one relationship, contends Sun–Diamond, the district court erred in denying its motion to dismiss Count I. See *United States v. Sun–Diamond Growers of California,* 941 F.Supp. 1262 (D.D.C.1996) (denying motion to dismiss); *United States v. Sun–Diamond Growers of California,* 964 F.Supp. 486 (D.D.C. 1997) (denying renewed motion for acquittal). In a narrower variation on this argument, Sun–Diamond also challenges the jury instructions, saying that they impermissibly allowed the jury to convict if it found that Sun–Diamond gave Secretary Espy things of value merely in recognition of his official position, regardless of official acts that might have supplied the motivation. We reject Sun–Diamond's broader argument but agree with its challenge to the jury instructions, and it is with that challenge that we begin.

The gratuity statute provides:

Whoever ... otherwise than as provided by law for the proper discharge of official duty ... directly or indirectly gives, offers, or promises anything of value to any public official, former public official, or person selected to be a public official, *for or because of any official act performed or to be performed* by such public official, former public official, or person selected to be a public official ... shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(1)(A) (emphasis added).

The statute defines an "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3).

The trial court charged the jury in full accord with the independent counsel's theory that gifts motivated by an official's status or position run afoul of the statute, regardless of whether the donor had any intent to affect or reward official conduct. Indeed, time and again the jury instructions hammered home that theme:

The gratuity statute makes it a crime for a person or company to knowingly and willingly give a public official a thing of value *because of his official position* whether or not the giver or receiver intended that particular official's acts be influenced. * * *

*The essence of the crime is the official's position* of [sic] as the receiver of the payment not whether the official agrees to do anything in particular, that is, not whether the official agrees to do any particular official act in return. Therefore ... to prove that a gratuity offense has been committed, it is not necessary to show that the payment is intended for a particular matter then pending before the official. *It is sufficient if the motivating factor for the payment is just to keep the official happy or to create a better relationship in general with the official.* * * *

It is sufficient if Sun–Diamond provided Espy with unauthorized compensation *simply because he held public office.* * * *

In order for you to convict Sun–Diamond of violating the gratuity statute, you must find beyond a reasonable doubt that Sun–Diamond gave the gifts to Mr. Espy *for or because of Mr. Espy's official government position* and not solely for reasons of friendship or social purpose. * * *

[T]he government must prove that Sun–Diamond Growers of California, acting through its senior vice president for corporate affairs, Richard Douglas, and know-

---

1. Count II charged Sun–Diamond with paying $3,100 for Espy's girlfriend to accompany him to the International Nut Conference in Athens. The jury acquitted on this count.

ingly and willingly gave the gratuities, at least in part, *because of the Secretary's position in appreciation of Sun–Diamond Growers of California's relationship with him as a public official or in anticipation of the continuation of its relationship with him as a public official. The government need not prove that the alleged gratuity was linked to a specific or identifiable official act or any act at all.*

(Emphases added.)

■■■ The language of the charge is far broader than that of the statute. To satisfy the criminal intent requirement embodied in the phrase "for or because of any official act," the giver must intend either to reward some past concrete official act or acts, or to enhance the likelihood of some future act or acts. This is the meaning we found in our most extensive discussion of the gratuity statute, *United States v. Brewster,* 506 F.2d 62 (D.C.Cir.1974). In addressing the claim that a violation of the gratuity statute is a lesser included offense subsumed within a violation of the bribery statute, now codified at § 201(b)(1)(A),[2] we necessarily compared the two provisions, explaining that the bribery provision required a more exacting showing of intent. *Id.* at 71–74. We characterized one aspect of the difference as follows:

The bribery section makes necessary an explicit *quid pro quo* which need not exist if only an illegal gratuity is involved; the briber is the mover or producer of the official act, but the official act for which the gratuity is given might have been done without the gratuity, *although the gratuity was produced because of the official act.*

*Id.* at 72 (emphasis added). As this passage makes tolerably clear, to say that the gratuity provision lacks a *quid pro quo* requirement is not to read the "official act" language

out of the statute. It is only to say that, in contrast to bribery, the gratuity and the official act need not each motivate the other. But the gratuity statute by its terms does still require at least a unidirectional relationship—the gift must be "for or because of" the act.

■■■ The relation may be simply one of reward. "As the word 'gratuity' implies, the intent most often associated with the offense is the intent to 'reward' an official for an act taken in the past or to be taken in the future." *United States v. Sawyer,* 85 F.3d 713, 730 (1st Cir.1996) (construing virtually identical Massachusetts gratuity statute). Even in such a case, the giver presumably hopes that his gratuity will affect the recipient's future conduct—and this was undoubtedly the concern that motivated Congress to bring rewards for past acts within the coverage of the statute. But, in contrast to bribery, it is enough under the gratuity statute if the defendant gives an unpromised benefit for a past governmental favor. And, whatever degree of intent to influence may be necessary for a bribe, a gift looking to future acts can be an unlawful gratuity where the giver is motivated simply by the desire to increase the likelihood of one or more specific, favorable acts. In summary, as we explained in *Brewster,* "under the gratuity section, 'otherwise than as provided by law ... for or because of any official act' carries the concept of the official act being done anyway, but the payment only being made *because of a specifically identified act.*" 506 F.2d at 82 (emphasis added).

The independent counsel appears to accept this analysis of *Brewster,* but claims that in that decision we restricted application of the official act requirement to cases involving elected officials or candidates for elective office. Indeed, Brewster was a senator, and we noted that in cases involving elected offi-

---

2. Section 201(b)(1)(A) imposes criminal penalties upon:

Whoever ... directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent ... to influence any official act. Because *Brewster* involved the acceptance rather than the giving of gratuities and bribes, the court

in fact focused on 18 U.S.C. § 201(c)(1) (1969) (covering receipt of bribes, now codified with minor differences in language at § 201(b)(2)(A)), and 18 U.S.C. § 201(g) (1969) (covering receipt of gratuities, now codified with minor differences in language at § 201(c)(1)(B)). The elements of the offense at issue here are the same, however, regardless of whether the defendant is the donor or donee, so *Brewster* stands as a controlling precedent for our case.

cials the official act requirement served the important function of distinguishing illegal gratuities from ordinary campaign contributions. See *id.* at 73 n. 26, 81. But in a footnote we postponed the question of non-elected officials to another day, distinguishing and declining to express ultimate disagreement with *United States v. Umans,* 368 F.2d 725 (2d Cir.1966), a decision that dispensed altogether with the intent requirement in a case involving gratuities offered to I.R.S. agents. *Brewster,* 506 at 73 n. 26.

Even assuming the footnote could be read as suggesting a readiness to jettison the intent requirement in cases involving appointed officials, we disappointed any such expectation eight years later by reaffirming the official act requirement in *United States v. Campbell,* 684 F.2d 141 (D.C.Cir.1982). *Campbell* concerned a Superior Court judge who received free moving services from a trucking firm that he had treated remarkably lightly, issuing nominal or suspended sentences on over 1,000 traffic tickets. We approved a jury charge requiring "that the alleged gratuities be given and received 'knowingly and willingly,' and *'for or because of an official act.'* " *Id.* at 150 (emphasis added). To be sure, the attack in *Campbell* came from the defendants, who claimed a right to an even more restrictive charge. But *Campbell* cannot possibly be said to have stripped the statute of its "for or because of" requirement.

A detail from that case underscores how we have refused to allow the official act requirement to be satisfied by some vague

hope of inducing warm feelings toward the donor. Campbell had served as Assistant Corporation Counsel for the District of Columbia before becoming a judge in 1973, and was reputed to have been "sympathetic to trucking interests" during that time. *Id.* at 149 n. 13. Yet, responding to a somewhat unclear claim that the jury might have convicted for uncharged prior acts, we noted that "[i]t is not even clear which 'acts' of Robert Campbell could have been the basis for [the trucking company's] gratuities prior to 1973, because 'sympathy to trucking interests' does not constitute an official act." *Id.* at 149 n. 14.[3] Here, too, if Douglas furnished Espy with gifts merely to win his generalized sympathy for Sun–Diamond, those gifts would not be illegal gratuities, unless the jury could find that Douglas sought this generalized sympathy to influence Espy to perform one or more official acts sometime in the future.

At oral argument we questioned the representative of the independent counsel on the application of his theory to instances where an old friend of some newly appointed officeholder took him to a meal or sports event while his firm had matters pending before the officeholder. Counsel appeared to assert that this scenario fell within his view of the statute.[4] Indeed, it would have been squarely within the district court's charge to the jury. But we trust that, should Congress someday decide to criminalize such conduct, it will *not* require that the gifts be given "for or because of any official act."

The independent counsel points to *United States v. Secord,* 726 F.Supp. 845, 847 (D.D.C.1989), as well as several decisions by

---

3. The independent counsel claims that these passages in *Campbell* turn on the notion that an Assistant Corporation Counsel is not in a position to perform official acts. The notion is false— under District law an Assistant Corporation Counsel may, for example, choose to prosecute (or not prosecute) traffic violations, D.C.Code §§ 23–101, 40–622. Perhaps because of its falsity, the notion is never mentioned by the *Campbell* court. Had the government charged Campbell with a pre–1973 decision not to prosecute the trucking company, rather than alleging mere "sympathy," such a decision might well have constituted an official act sufficient to support a gratuity charge.

4. The colloquy at oral argument was as follows:
   THE COURT: So if an old friend of mine from law school who's a partner in a firm that has a pending case before this Court takes me to a

baseball game, as we've done for years, that's an illegal gratuity?
COUNSEL: It may well be, yes.
THE COURT: You're serious?
COUNSEL: If you have a case, if [counsel for Sun–Diamond] takes you to the game tomorrow, takes you to the Redskins game on Sunday while you have this case pending before you, that's a gratuity.
Oral Arg. Tr. at 30–31. The independent counsel's theory here seems truly sweeping: if this hypothetical baseball arrangement has been in place "for years," stretching back to before the judge's investiture, it is difficult to see how it could be motivated by the judge's position. Even if the baseball invitation represented an increment in the donor's hospitality to his friend since the latter's appointment, under this circuit's reading of the statute it would violate § 201(c)(1)(A) only if offered, as the statute says, "for or because of any official act."

other courts of appeals apparently holding that gifts motivated solely by the recipient's official position may be illegal gratuities. See *United States v. Evans,* 572 F.2d 455, 480 (5th Cir.1978); *United States v. Standefer,* 610 F.2d 1076, 1080 (3d Cir.1979) (en banc);[5] *Umans,* 368 F.2d at 730; *United States v. Bustamante,* 45 F.3d 933, 940 (5th Cir.1995); cf. *United States v. Alessio,* 528 F.2d 1079, 1082 (9th Cir.1976) (suggesting that donee's ability to use his position for donor's benefit was enough to satisfy the official act requirement). These decisions appear to leap from the gratuity statute's lack of a reciprocal *quid pro quo* requirement to an assumption that it has dispensed with any need to show intent focused on an official act or acts. Thus, the court in *Bustamante* says, "Generally, no proof of a *quid pro quo* is required; it is sufficient for the government to show that the defendant was given the gratuity simply because he held public office." 45 F.3d at 940. Any such leap disregards the explicit language of the statute and contradicts *Brewster* and *Campbell.* Other out-of-circuit cases seem to take the official act requirement more seriously. See, e.g., *United States v. Muldoon,* 931 F.2d 282, 287 (4th Cir.1991) ("an illegal gratuity is a payment made for an act by the recipient that might have been done without any payment") (citing *Brewster* ); cf. *Sawyer,* 85 F.3d at 735–36 (construing virtually identical Massachusetts gratuity statute).

Finally, the independent counsel asserts that in *United States v. Baird,* 29 F.3d 647 (D.C.Cir.1994), we embraced his broad interpretation of the gratuity statute. The question in *Baird* was whether the conflict of interest statute, 18 U.S.C. § 203(a), requires the government to prove that a defendant knew the statute covered him. We held that the clause "otherwise than as provided by law," which appears both in § 203(a) and in § 201(c) (then codified at §§ 201(f) and (g)), did not embody such a *scienter* requirement; rather, it merely required a showing that the public official received money to which he was not lawfully entitled. *Id.* at 652. Although the *Baird* opinion cited approvingly to both *Evans* and *Standefer,* see *id.,* it did not address directly the "for or because of any official act" language—doubtless because the conflict of interest statute at issue contained no such language.

■ Given that the "for or because of any official act" language in § 201(c)(1)(A) means what it says, the jury instructions invited the jury to convict on materially less evidence than the statute demands—evidence of gifts driven simply by Espy's official position. The difference may not seem very great, for whenever a donor has matters actually or potentially pending before his donee, gifts motivated by the latter's position will usually also be motivated by a desire to reward or elicit favorable official action. But the terms of the statute require a finding that the gifts were motivated by more than merely the giver's desire to ingratiate himself with the official generally, or to celebrate the latter's status.

■ In his effort to salvage the instructions, the independent counsel points to other portions of the charge in which the judge simply repeated the terms of the statute or the indictment verbatim, e.g., by reciting the words "for or because of an official act." These recitations could not possibly, however, have overcome the broader message. Thus the charge failed to give the jury an adequate understanding of the issues, see *United States v. DeFries,* 129 F.3d 1293, 1304 (D.C.Cir.1997), and the error cannot be called technical or harmless, see *United States v. Lemire,* 720 F.2d 1327, 1339 (D.C.Cir.1983). We reverse and remand for a new trial on Count I.[6]

---

**5.** The independent counsel's briefs made no mention of *Standefer,* but in a petition for rehearing he notes that the Supreme Court, in affirming the judgment on others grounds, *Standefer v. United States,* 447 U.S. 10 (1980), said in a footnote that "the instructions to the jury on criminal intent" were "correct." *Id.* at 14 n. 8. *Standefer's* briefs in the Supreme Court and the Third Circuit's unpublished panel opinion, *United States v. Standefer,* 1979 WL 4863 (3d Cir.1979), however, make clear that the defendant's challenge was to the absence of a *quid pro quo* requirement, and to the trial court's refusal to instruct the jury that

the defendant's gifts to an I.R.S. agent had not in fact resulted in the favorable audit sought by the donor. *Id.* at *4–8. In any event, the instructions in *Standefer,* reprinted in relevant part in the Third Circuit's panel opinion, *id.* at *5, *6, were far narrower than the charge in this case, repeatedly emphasizing the requirement that the gifts be given for or because of tax audits performed by the donee.

**6.** We reject Sun–Diamond's contention that the gratuity statute is unconstitutionally vague as applied to its conduct. *United States v. Campbell,*

At the same time, we reject Sun–Diamond's broad attack on the indictment. Again *Campbell* controls. Campbell argued, much as Sun–Diamond does here, that the jury should have been required "to find that the gratuity was conferred with 'specific knowledge' of 'a definite official action for which compensation was intended.' " 684 F.2d at 149. We rejected that argument, holding that it was sufficient for the jury to find that the trucking company had provided free services to Campbell because it believed the judge had been, or would later be, "generally lenient" in dealing with the company's voluminous traffic citations. *Id.* at 149–50. The government, we held, was not required to show that any particular free service provided to Campbell was earmarked for any particular ticket or tickets; leniency in a multitude of specific acts was enough. That an official has an abundance of relevant matters on his plate should not insulate him or his benefactors from the gratuity statute—as long as the jury is required to find the requisite intent to reward past favorable acts or to make future ones more likely.

The Fraudulent Scheme

Sun–Diamond was found guilty on Counts III and IV of committing wire fraud in violation of 18 U.S.C. §§ 1343 & 1346, and on Counts V through IX of violating the Federal Election Campaign Act, 2 U.S.C. §§ 441b(a) & 441f ("FECA"). Both sets of convictions flow from a scheme of Richard Douglas and James H. Lake to help repay the debts of the failed congressional campaign of Mike Espy's brother Henry. The following facts about the scheme come from the testimony of Lake, who was granted immunity by prosecutors in exchange for his cooperation.

Lake was one of the founding partners of a Washington based firm, Robinson Lake Sawyer & Miller ("RLSM"), which handled communications and public relations matters for Sun–Diamond.[7] Sun–Diamond retained RLSM for a fee of $20,000 a month; Douglas oversaw Sun–Diamond's dealings with RLSM and maintained his own office there. RLSM

was a wholly-owned subsidiary of Bozell Worldwide, Inc. ("Bozell").

After Mike Espy became Secretary of Agriculture, Henry Espy unsuccessfully pursued election to his brother's vacant seat in Congress, building up a sizable campaign debt in the process. In February 1994 Douglas left a telephone message at Lake's office—a crucial act for jurisdiction over one of the wire fraud counts. When Lake contacted Douglas, he learned that Secretary Espy had asked Douglas for help in retiring his brother's campaign debt. Lake immediately offered to donate $1,000, the maximum permissible individual contribution. Douglas replied that he had to raise at least $5,000 fast, and that he needed Lake's help. He then proposed a way around the campaign finance restrictions. If Lake would get five RLSM employees (including Lake himself) to write a check for $1,000 each, Douglas would find a way for Sun–Diamond to reimburse them all. Lake knew the scheme was illegal—corporations are forbidden to make contributions "in connection with any election" for Congress, 2 U.S.C. § 441b(a), and no one may make a campaign contribution in the name of another person, 2 U.S.C. § 441f—but agreed to participate anyway. Lake testified that no one else at RLSM or Bozell knew about the plan.

Lake wrote a $1,000 check in his own name and then approached the four RLSM employees identified by Douglas. Three of them agreed to pay up. (A fourth—presumably suspicious about the notion of a reimbursable campaign contribution—declined.) Lake then passed the checks worth $4,000 to Douglas, who deposited them in a "Henry Espy for Congress" account he had opened.

As the vehicle for reimbursement, Douglas settled on the Joint Center Dinner, an annual benefit for which RLSM and Lake had in the past routinely bought tickets on Sun–Diamond's behalf. Lake's staff prepared an internal RLSM document authorizing reimbursement to Lake for his supposed purchase of tickets to the dinner in the amount of $5,000 (even though he had raised only

684 F.2d 141, 150 n. 17 (D.C.Cir.1982); cf. *United States v. Brewster,* 506 F.2d 62, 76–78 (D.C.Cir.1974).

**7.** At certain points in the record this firm is referred to by somewhat different names, such as

"RLLM/SMG" (Robinson, Lake, Lerer, Montgomery/Sawyer, Miller Group). For simplicity we will refer to Lake's partnership as RLSM throughout.

$4,000 for Henry Espy). The same document became part of the monthly invoice sent to Sun–Diamond, billing the client $5,000 for the fictitious dinner attendance on top of its $20,000 monthly retainer and other expenses. Lake received a $5,000 reimbursement check from Bozell, which he cashed and used to pay back the three other individual contributors (apparently pocketing the extra $1,000 for himself). Douglas, as part of his normal duties at Sun–Diamond, approved the payment to RLSM, which eventually went through. The net result: a $5,000 expenditure by Sun–Diamond, $4,000 of which went into Henry Espy's campaign coffers and $1,000 into James H. Lake's pocket.[8] The independent counsel charged that the scheme worked a fraud on Bozell and RLSM, depriving the former (albeit temporarily) of $5,000, and depriving the latter of the "honest services" of its agent Lake under 18 U.S.C. § 1346. The jury convicted, evidently convinced that at least one such deprivation occurred. The jury also found Sun–Diamond guilty of making illegal campaign contributions in violation of FECA, 2 U.S.C. §§ 441b(a) & 441f.

■ As a threshold matter, Sun–Diamond raises a challenge which it says goes equally to the wire fraud and FECA counts. Richard Douglas's campaign contribution scheme cannot be attributed to it, Sun–Diamond argues, because Douglas was not acting with an intent to benefit the corporation. It is true, as the district court instructed the jury in this case, that an agent's acts will not be imputed to the principal in a criminal case unless the agent acts with the intent to benefit the principal.[9] Here, Sun–Diamond says, Douglas's scheme was designed to—and did in fact—*defraud* his employer, not benefit it. In this circumstance, it strenuously argues, there can be no imputation: "[T]o establish precedent holding a principal *criminally* liable for the acts of an agent who defrauds and deceives the principal while pursuing matters within his self-interest merely because the agent's conduct *may* provide some incidental benefit to the principal serves to punish innocent principals with no countervailing policy justifications." Appellant's Reply Br. at 16 n.9.

■ This argument has considerable intuitive appeal—Sun–Diamond does look more like a victim than a perpetrator, at least on the fraud charges. The facts in the record, however—that Douglas hid the illegal contribution scheme from others at the company and used company funds to accomplish it—do not preclude a valid finding that he undertook the scheme to benefit Sun–Diamond. Part of Douglas's job was to cultivate his, and Sun–Diamond's, relationship with Secretary Espy. By responding to the Secretary's request to help his brother, Douglas may have been acting out of pure friendship, but the jury was entitled to conclude that he was acting instead, or also, with an intent (however befuddled) to further the interests of his employer. The scheme came at some cost to Sun–Diamond but it also promised some benefit. See, e.g., *United States v. Automated Medical Laboratories, Inc.*, 770 F.2d 399, 406–07 (4th Cir.1985) (agent's conduct which is actually or potentially detrimental to corporation may nonetheless be imputed to corporation in criminal case if motivated at least in part by intent to benefit it); cf. *Local 1814, International Longshoremen's Association, AFL–CIO v. NLRB*, 735 F.2d 1384, 1395 (D.C.Cir.1984) ("[T]he acts of an agent motivated partly by self-interest—even where self-interest is the predominant motive—lie within the scope of employment so long as the agent is actuated by the principal's business purposes 'to any appreciable extent.'") (quoting *Restatement (Second) of Agency* § 236 & comment b (1957)). Where there is adequate evidence for imputation (as here), the only thing that keeps deceived corporations from being indicted for the acts of their employee-deceivers is not some fixed rule of law or logic but simply the sound exercise of prosecutorial discretion.

---

8. In October 1995 RLSM terminated its relationship with Sun–Diamond and returned the $5,000 payment.

9. In a civil case, there may be no need to show that the agent acted to further the principal's interests—a showing of "apparent authority" is often enough. See *American Society of Mechanical Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 573–74, 102 S.Ct. 1935, 1946–47, 72 L.Ed.2d 330 (1982) (private antitrust action).

And the answer to Sun–Diamond's claim of the absence of any "countervailing policy justification" is simply the justification usually offered in support of holding corporate principals liable for the illegal acts of their agents: to increase incentives for corporations to monitor and prevent illegal employee conduct. See Kevin B. Huff, Note, *The Role of Corporate Compliance Programs in Determining Corporate Criminal Liability: A Suggested Approach,* 96 Colum. L.Rev. 1252, 1263 & n.49 (1996). One might well question this justification—and scholars have. See, e.g., Daniel R. Fischel and Alan O. Sykes, *Corporate Crime,* 25 J. Legal Stud. 319 (1996) (arguing that corporate criminal liability spurs excessive monitoring and litigation costs and should be discarded in favor of civil liability); Jennifer Arlen, *The Potentially Perverse Effects of Corporate Criminal Liability,* 23 J. Legal Stud. 833 (1994) (arguing that strict corporate liability may *deter* corporate monitoring by making criminal exposure more likely, so that its imposition may increase the likelihood of crime). Moreover, the justification may be at its weakest in cases like this one, where the offending employee breaches a duty of honesty to the very corporation whose goals he aims to advance. In any event, Sun–Diamond's argument here, whatever its merit as an issue of policy, has no real grounding in the relevant statutes. And Sun–Diamond does not invoke the Constitution, which in any event would require either an overruling of the Supreme Court's rejection of a due process attack on corporate liability, *New York Cent. & Hudson River R.R. Co. v. United States,* 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613 (1909), or the development of some new theory.

■ Sun–Diamond also raises a narrower objection concerning imputation, one which goes only to the fraud counts. To the extent Douglas's conduct is to be imputed to his employer, argues Sun–Diamond, then so must Lake's be imputed to his employers (RLSM and Bozell). Both men occupied high-level management positions in their respective firms, and both men's firms sought to establish and maintain good relations with Secretary Espy. If Douglas's knowledge can be imputed to Sun–Diamond to hold it responsible for Douglas's acts, then Lake's

must be imputed to his employers, RLSM and Bozell, and they cannot be victims.

■ Even assuming the evidence showed the balance of private and corporate purpose in Douglas's and Lake's motivation to be identical, Sun–Diamond's argument rests on a faulty assumption—that the imputation rules must be the same on both the perpetrator and victim sides. They need not be, and indeed are not. Imputation is a legal fiction designed to assist in the allocation of liability, not a literal description of the state of a principal's knowledge. The law imputes the wrongdoer's conduct to the corporation in order to encourage monitoring, but it is not at all clear that imputation on the other side of the equation would be useful in eliciting additional caution on the part of would-be fraud victims. A rule that makes victim wariness a condition of criminally punishing the perpetrator—unlike, say, a rule of contributory negligence in tort—might not inspire much extra precaution in potential victims. However much they may benefit from the criminalization of fraud generally, potential victims (who have many incentives to avoid being gulled, independent of the criminal law) seem unlikely to step up their precautions just to increase the *ex ante* chances that their deceivers will face criminal sanctions—or so Congress could reasonably conclude. Thus, when an individual is swindled, the offender does not escape mail or wire fraud liability just because the victim was unwary, or even "gullible." See *United States v. Brien,* 617 F.2d 299, 311 (1st Cir. 1980). Indeed, Congress's adoption of 18 U.S.C. § 1346, specifying that the term "scheme or artifice to defraud," as used in various federal criminal fraud statutes, should include schemes to deprive a principal "of the intangible right of honest services," is hard to square with an imputation rule on the victim side as broad as the one governing corporate criminal responsibility.

■ We pause briefly over a final threshold issue before addressing the core of Sun–Diamond's challenge to the fraud convictions. The wire fraud statute forbids the use of the interstate telephone system "for the purpose of executing" a scheme or artifice to defraud.

18 U.S.C. § 1343. Sun–Diamond says the telephone message left by Douglas for Lake preceded their joint concoction of the campaign contribution scheme and thus could not, as a matter of law, have furthered the scheme.[10] There was, however, ample evidence from which the jury could find that Douglas already had some sort of fraudulent plan in mind when he placed the initial call and left the message. In other words, the jury could have found that Douglas used the telephone system "prior to, and as one step toward, the receipt of the fruits of the fraud," *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944), placing the case within the coverage of § 1343.

■ Sun–Diamond's core challenge to the wire fraud counts raises more serious concerns. The district court charged the jury on two alternative routes to fraud liability. It could convict, said the court, if it found "that Sun–Diamond Growers of California devised a scheme or artifice to defraud with one or both [of] the two following objectives. One, to obtain even temporarily $5,000 from Bozell, Inc. by means of false pretense and representations in order to make an illegal corporate campaign contribution to Henry Espy for Congress Committee. Two, to deprive Bozell, Inc. and [RLSM] of the honest, conscientious, faithful, loyal, disinterested and unbiased services of its employee, James Lake." Because the jury charge was phrased in the disjunctive we must examine the legal sufficiency of each basis for liability, to ensure that the jury did not convict on a legally impermissible ground. See *Griffin v. United States,* 502 U.S. 46, 59, 112 S.Ct. 466, 474, 116 L.Ed.2d 371 (1991) (general verdict based on alternative grounds of liability will be upheld as long as both grounds are legally adequate, even if one is factually inadequate).

■ As for the first possible objective, we admit that it is not immediately obvious how the contribution scheme could have been designed to deprive Bozell even temporarily of its money or property. Sun–Diamond, through Douglas, caused Bozell to make a routine advance of $5,000 with every expectation that Sun–Diamond would provide prompt reimbursement, and in fact it reimbursed the expense promptly and in full. As the district court correctly noted in the sentencing phase, Bozell was deprived only of the time value of the sum advanced, a deprivation it surely considered negligible judging from the routine and informal nature of the transaction.

In a case involving fraudulently obtained consumer credit, however, we held that where a defendant makes "material misrepresentations designed to induce an extension of credit that would not otherwise be made, the jury [may] reasonably infer intent to defraud," even if the borrower intended in good faith to repay the loan. *United States v. Alston,* 609 F.2d 531, 538 (D.C.Cir.1979). Moreover, other courts have held that actual repayment is no defense to a charge of fraudulently obtaining a loan, presumably because a loan obtained by fraud subjects the lender to a greater risk of loss than it would have voluntarily borne were it fully informed. *United States v. Scott,* 701 F.2d 1340, 1346–48 (11th Cir.1983); *United States v. Sindona,* 636 F.2d 792, 800 (2d Cir.1980); see also *United States v. Hollis,* 971 F.2d 1441, 1452–53 (10th Cir.1992) (repayment not a defense to bank fraud under 18 U.S.C. § 1344); *United States v. Allen,* 76 F.3d 1348, 1358–59 (5th Cir.1996) (bank was defrauded, at least temporarily, when cashier's checks were fraudulently drawn on bank's account, even though bank was reimbursed in full by holding company at end of month). Notably, to the extent repayment in those cases included interest they did not even feature the time-value deprivation that is present here. Moreover, although the misrepresentation here did not go to the likelihood of the advance being repaid, it was nonetheless material: had Bozell known that the $5,000 was being used to launder an illegal campaign contribution rather than to reserve a table at a charitable dinner, it would not have authorized the advance. Just as deceitful assurances of legality in a conventional loan expose the lender to costly legal entanglements

**10.** This challenge goes only to Count III. The wire communication underlying Count IV was the electronic transmission of the $5,000 billable expense report from RLSM to Bozell.

(quite apart from risks of non-repayment), so too did the concealment here.[11]

■ The second alternative ground of liability was that Sun–Diamond defrauded RLSM of the honest services of its agent, James H. Lake, in violation of 18 U.S.C. § 1346. Congress enacted that provision in response to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which held that the mail fraud statute's coverage was limited to deprivations of property.[12] Section 1346 says simply that "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. The "honest services" theory has typically been used, both in cases up to *McNally* and again under § 1346, as a tool for prosecuting corrupt public officials who have deprived citizens of their right to honest representation. See *United States v. Paradies*, 98 F.3d 1266, 1283 n. 30 (11th Cir.1996) (collecting cases). But it has also been used, as here, to prosecute private citizens who defraud private entities. See, e.g., *United States v. Lemire*, 720 F.2d 1327 (D.C.Cir.1983); *United States v. DeFries*, 129 F.3d 1293, 1305–06 (D.C.Cir.1997); *United States v. Jain*, 93 F.3d 436 (8th Cir. 1996); *United States v. Frost*, 125 F.3d 346 (6th Cir.1997); *United States v. D'Amato*, 39 F.3d 1249 (2d Cir.1994); *United States v. Cochran*, 109 F.3d 660 (10th Cir.1997); *United States v. Gray*, 96 F.3d 769 (5th Cir.1996).

■ In the private sector context, § 1346 poses special risks. Every material act of dishonesty by an employee deprives the employer of that worker's "honest services," yet not every such act is converted into a federal crime by the mere use of the mails or interstate phone system. Aware of the risk that federal criminal liability could metastasize, we held in *Lemire* that "not every breach of a fiduciary duty works a criminal fraud." *Lemire*, 720 F.2d at 1335, quoting *United States v. George*, 477 F.2d 508, 512 (7th Cir.1973). Rather, "[t]here must be a failure to disclose something which in the knowledge or contemplation of the employee poses an independent business risk to the employer." *Id.* at 1337.[13] Absent reasonably foreseeable economic harm, "[p]roof that the employer simply suffered only the loss of the loyalty and fidelity of the [employee] is insufficient to convict." *Frost*, 125 F.3d at 368.

The independent counsel says that Douglas and Lake's fraudulent scheme threatened serious economic harm to RLSM, because disclosure of a name partner's fraudulent use of RLSM's offices to funnel illegal contributions to a political candidate would severely damage the firm's reputation. The district court agreed, 964 F.Supp. at 493–94. As Lake testified, the chief assets of a public relations firm are its legitimacy and credibility in the eyes of current and potential clients. Both stood to be undermined by Douglas and Lake's actions. There is no doubt that Douglas and Lake could have foreseen that their actions would cause substantial economic harm to RLSM once word of the scheme got out.

Sun–Diamond, however, says this is not enough. It contends that in the private sector context § 1346 and *Lemire* demand a

---

11. Sun–Diamond also offers another reason why Douglas could not have intended to defraud Bozell. According to Sun–Diamond, Douglas anticipated that Sun–Diamond would reimburse Lake directly, or at least that Lake's employer would await payment from Sun–Diamond before reimbursing Lake, thus avoiding even a temporary deprivation. (In fact Sun–Diamond contends, implausibly, that there was no evidence from which a jury could infer that Douglas even knew of Bozell's existence.) Given Douglas's experience with Sun–Diamond/RLSM billing practices, however, he could reasonably have foreseen the possibility that Lake would seek an advance from his employer or its parent company at the time he hatched the scheme.

12. The elements required for conviction under § 1341 (mail fraud) and § 1343 (wire fraud) are identical except for the means of communication. *United States v. Lemire*, 720 F.2d 1327, 1334–35 n. 6 (D.C.Cir.1983).

13. *Lemire* was a pre-§ 1346 decision, but Congress's evident intent in enacting that provision was to revive pre-*McNally* caselaw, at least with respect to the deprivation of honest services. See, e.g., *Frost*, 125 F.3d at 364 ("We therefore hold that § 1346 has restored the mail fraud statute to its pre-*McNally* scope, according to previous opinions interpreting the intangible right to honest services.").

showing that the defendant *intended* to cause economic harm to his victim, not merely that he could have reasonably foreseen such harm. Since the economic harm identified by the independent counsel flows exclusively from disclosure of the contribution scheme, and since Douglas surely did not intend for his scheme to be revealed (except possibly to Mike Espy, so that the Secretary's gratitude could be properly directed), Sun–Diamond reasons that it is free from liability under § 1346. In response to this argument, it will not do to cite "the presumption, common to the criminal and civil law, that a person intends the natural and foreseeable consequences of his voluntary actions." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 278, 99 S.Ct. 2282, 2295, 60 L.Ed.2d 870 (1979). Applying the presumption to the actual detection and revelation of an illegal scheme would threaten to turn the word "intent" inside out. Is a criminal who foresees his own capture thereby said to intend it? If so, are especially elusive criminals, whose apprehension is *ex ante* relatively unlikely, in a better legal position than clumsy ones?

We need not address these questions, because we disagree with Sun–Diamond's contention that § 1346 and *Lemire* require the government to show that the defendant intended to cause economic harm to his victim. Sun–Diamond appears to confuse the requirement of an intent to defraud (amply met here, since the crux of the scheme was the submission of a fictitious expense report to RLSM) with a requirement of intent to cause economic harm. But *Lemire* did not go so far as to say that economic harm must be part of the defendant's intent in a private-sector "honest services" case—only that economic harm be within the defendant's reasonable contemplation. Although *Lemire* dealt with failure to disclose a conflict of interest rather than with an active scheme to defraud, its treatment of the foreseeability issue governs this case:

> So long as the jury finds the non-disclosure furthers a scheme to abuse the trust of an employer in a manner that makes an identifiable harm to him, apart from the breach itself, *reasonably foreseeable*, it may convict the employee of wire fraud. The crucial determination must be whether the jury could infer that the defendant *might reasonably have contemplated* some concrete business harm to his employer . . .

*Lemire*, 720 F.2d at 1337 (emphasis added); see also *United States v. Von Barta*, 635 F.2d 999, 1005–06 n. 14 (2d Cir.1980) (relied on in *Lemire*). As we reaffirmed recently, "*Lemire* held that breaches of fiduciary duty are criminally fraudulent only when 'accompanied by a misrepresentation or nondisclosure that is intended *or is contemplated* to deprive the person to whom the duty is owed of some legally significant benefit.'" *DeFries*, 129 F.3d at 1306, quoting *Lemire*, 720 F.2d at 1335 (emphasis added). See also *Frost*, 125 F.3d at 368 (holding that, in cases where employee is charged with defrauding private employer of his own honest services, "[t]he prosecution must prove that the employee intended to breach a fiduciary duty, and that the employee *foresaw or reasonably should have foreseen* that his employer might suffer an economic harm as a result of the breach.") (emphasis added); *D'Amato*, 39 F.3d at 1257 (pre-§ 1346 case holding that misrepresentations amounting only to a deceit "must be coupled with a contemplated harm to the victim").

We therefore affirm the convictions for wire fraud on Counts III and IV.[14]

Sentencing Issues

Sun–Diamond challenges two aspects of its sentence: the district court's upward departure based on Espy's position as Secretary of Agriculture, and the imposition of reporting requirements on the member cooperatives. We agree with Sun–Diamond and reverse on both points.

District courts may make upward departures from the Sentencing Guidelines only if "there exists an aggravating . . . circumstance of a kind, or to a degree, not

---

**14.** Sun–Diamond does not challenge the adequacy of the jury charge on the "honest services" theory of liability under §§ 1343 & 1346.

adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b); U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 5K2.0. We review district court determinations that a given factor is present in a particular case to a degree not adequately considered by the Commission only for abuse of discretion, because "[d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do." *Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996). But whether a given factor could *ever* be a permissible basis for departure is a question of law which we address *de novo. Id.* Here, the issue is in a sense one of degree—how much authority and status might elevate a position above even the rank for which the Guidelines prescribe an eight-level hike—but it also poses the onetime issue of whether cabinet-level officers enjoy such lofty status, hardly the sort of fact-intensive issue calling for extreme deference.

The guideline applicable to violations of the gratuity statute prescribes a base offense level of 7. U.S.S.G. § 2C1.2. It calls for a two-level increase if the offense involved more than one gratuity, and an eight-level increase

> [i]f the gratuity was given, or to be given, to an elected official or any official holding a high-level decisionmaking or sensitive position.

*Id.* The district court imposed both the two-level and the eight-level increase, bringing the offense level to 17. It then appended an additional two-level increase, finding that the Guidelines did not adequately take into account Espy's position as a cabinet-level official. This increase in offense level from 17 to 19 doubled Sun–Diamond's base fine from $250,000 to $500,000. U.S.S.G. § 8C2.4. The court then assigned Sun–Diamond a "culpability score" of 9 out of a possible 10, see *id.* § 8C2.5, a determination Sun–Diamond does not challenge here. This culpability score dictated a minimum multiplier of 1.8

and a maximum of 3.6, *id.* § 8C2.6, leading to an applicable fine range of $900,000 to $1,800,000, from which the court chose a figure in the "upper range"—$1,500,000.

In support of departing upward on account of the high level of the donee's position, the district court reasoned:

> The President has but one cabinet with select members who the court deems to be on a higher level with regard to the type of responsibility which is otherwise contemplated by the guidelines, and the Secretary of Agriculture, in fact, is tenth in the order of succession to the Office of the Presidency. That is not an insignificant fact, and as unlikely as it may be that the Secretary of Agriculture would assume the Presidency of the United States because circumstances would not normally present that opportunity, nevertheless, there is a reason for creating a pecking order to the position which many believe is the position of the most powerful person on the face of the earth.
>
> In any event, the court [notes] for example that Secretary Espy administered a budget of $65 and one half billion, this figure represents 4.3 percent of the total federal budget. He's responsible for a great work force and makes decisions frequently that have a significant and broad and wide-ranging effect on the American population, and some might believe on the population of ... other parts of the world.

As the Secretary of Agriculture obviously holds a "high-level decision-making or sensitive position," it is clear that the district court rested its departure not on a finding that cabinet-level status was the *kind* of factor the Sentencing Commission failed to consider in formulating § 2C1.2, but on a belief that his position is so high-level that it represents an aggravating circumstance present to a *degree* not taken into account by the Commission.

This conclusion is at odds with the Sentencing Commission's explanation of § 2C1.2.[15] The Application Notes explain

---

15. "In determining whether a circumstance was adequately taken into consideration the court

shall consider only the sentencing guidelines,

that " 'Official holding a high-level decision-making or sensitive position' includes, for example, prosecuting attorneys, judges, agency administrators, supervisory law enforcement officers, and other governmental officials with similar levels of responsibility." U.S.S.G. § 2C1.2, App. Note 1. We do not think the Secretary of Agriculture holds a position that in level or sensitivity differs in any material degree from persons the Application Note explicitly says were within the Commission's contemplation.

Since the Secretary administers an agency, a straightforward reading of the Application Note strongly suggests that he falls within the "agency administrator" category. The independent counsel says that this term was meant to refer to lower-level program administrators, of which it says there are 85 or so within USDA alone, Appellee's Br. at 43 n.15, but never explains why we should assume the Sentencing Commission had such a limited category in mind. The Application Note expressly lists judges as the sort of high-level officials for which the eight-level departure is appropriate. Perhaps our perspective is skewed, but offering a gratuity to a life-tenured federal judge seems to us at least as culpable as offering one to a cabinet secretary—indeed, we suspect most citizens would consider the former a more troubling breach of public trust than the latter. To permit a two-level departure for the latter, when such a departure is specifically precluded for the former, appears illogical.

Nor is the district court's decision rescued by its observations about presidential succession. The Guideline includes elected officials without apparent regard to the loftiness or sensitivity of their positions, and the Application Note says nothing to suggest variation within the elected-official category. Thus it appears to sweep in officials ranging in rank from Representative to President. Even assuming that a case involving the President might present a *sui generis* situation warranting departure, Sun–Diamond points out that the Speaker of the House is second in

line to the presidency after the Vice President, 3 U.S.C. § 19, and yet is also presumably taken into account by § 2C1.2 as an "elected official." The independent counsel responds that "perhaps the Sentencing Commission did not take into consideration the position and power of the Speaker of the House when it drafted the bribery and gratuity guidelines." Appellee's Br. at 45 n.16. Conceivably, but more likely the Commission meant, as it said, to lump all federal elected officials together, in contrast with other officials whose rank was seen to vary enough to require consideration of levels of responsibility. Similarly, the Attorney General—seventh in line to the presidency—seems to fit within the Application Note's "supervisory law enforcement officers" category. Though we need not, and do not, decide today the status of these officials with respect to § 2C1.2, their seeming inclusion argues strongly against the idea that the Sentencing Commission failed to take adequately into account the degree of responsibility of an official further down the line of presidential succession.

Moreover, the district court's approach makes one wonder how far one must go down the line of succession before one finally reaches the heartland of § 2C1.2. The Secretary of Agriculture is in fact ninth in the line of succession, 3 U.S.C. § 19, not tenth as the district court stated.[16] This makes his connection to ultimate power just as attenuated as that of the anti-hero of "Kind Hearts and Coronets," who had to murder eight Alec Guinnesses to become Duke of Chalfont. What of the Secretary of Health and Human Services, at number twelve in the queue, *id.*, or the Secretary of Veterans Affairs, at seventeen, *id.*? Of course, questions of line-drawing are often difficult, and in the sentencing arena such questions are normally best resolved by the district courts on a case-by-case basis. Here, however, the factor invoked in support of departure—cabinet-level status—is not one that the district courts

policy statements, and official commentary of the Sentencing Commission." 18 U.S.C. § 3553(b).

**16.** The current Secretary of Agriculture, however, is in practical effect eighth in line, since

Secretary of State Madeleine Albright, having been born abroad, is ineligible. See U.S. Const. art. II, § 1, cl. 5.

enjoy any comparative advantage in assessing, unlike such fine-grained, fact-bound circumstances as extreme psychological injury, see U.S.S.G. § 5K2.3, or victim misconduct, see *id.* § 5K2.10. We conclude that the two-level upward departure was impermissible.

Sun–Diamond also challenges the imposition of reporting requirements on its member cooperatives. The district court declared, as a condition of probation, that "Sun–Diamond and its members [sic] cooperatives shall provide quarterly submissions to the probation officer reporting all of the organization's expenditures related to all federal employees, office holders or candidates for federal office [including] any expenditure related [to] the procurement of any federal government contract, creation of a federal law or regulation, or the development of any federal policy." These requirements were to continue in force for five years.

We recognize that the sentencing judge has broad discretion to establish conditions of probation. *Lemire,* 720 F.2d at 1352. But we know of no precedent for the imposition of probationary conditions on entities who are not defendants, nor even agents of defendants—the latter category problematic in its own right, but much more plausibly legitimate than the present case. Although the independent counsel paints Sun–Diamond as a mere alter ego of the cooperatives that own it, we are not persuaded. The member cooperatives have their own corporate identities, boards of directors, employees, assets and liabilities, as does Sun–Diamond. Their power to control Sun–Diamond seems no greater than the power of ordinary shareholders to control a corporation.

As the Ninth Circuit has explained, imposition of a condition on a third party exposes the defendant to revocation of probation for "violations" by persons not under his control. *United States v. Sweeney,* 914 F.2d 1260, 1263 (9th Cir.1990). Cf. *Fiore v. United States,* 696 F.2d 205, 208–09 (2d Cir.1982) (reversing condition of probation imposed on defendant who was president, secretary, sole stockholder and only full-time employee of corporate co-defendant, which had required him to pay fine imposed on corporation). And 18 U.S.C. § 3563, which enumerates mandatory and discretionary conditions of probation, specifies in every one of them the "defendant" as the person to be burdened. See *Sweeney,* 914 F.2d at 1263. As the member cooperatives were not made defendants and given an opportunity to be heard, they may not now be subjected to probation.

\* \* \*

We reverse and remand for new trial on Count I; we affirm the convictions on Counts III through IX; and we vacate Sun–Diamond's sentence and remand for further proceedings consistent with this opinion.

*So ordered.*